**H. B. WOLFSEN, Helen Wolfsen, L. C. Wolfsen, and Myrna Wolfsen,**

v.

**UNITED STATES.**

No. 115–55.

United States Court of Claims.

May 7, 1958.

---

Francis M. Shea, Washington, D. C., for plaintiffs. Edward G. Chandler, San Francisco, Cal., Lawrence J. Latto, and Richard T. Conway, Washington, D. C., were on the briefs.

Howard O. Sigmond, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

WHITAKER, Judge.

Plaintiffs are the owners of certain tracts of land in Merced County, California, most of which are riparian to Salt Slough, which is a branch channel of the San Joaquin River. They allege that they have been deprived of their water rights by the construction and operation by the defendant of the Central Valley Project in California. They sue for just compensation.

The physical characteristics of the San Joaquin River, its watershed and drainage basin, the historic development of the San Joaquin Valley, and the origin, construction, and operation of the Central Valley Project (including the operation of Friant Dam prior to integrated operation of the Central Valley Project) are fully set forth in our findings of fact. Findings and summaries of many of the same facts have been made in earlier cases before this court. Gerlach Live Stock Company v. United States, 1948, 76 F. Supp. 87, 111 Ct.Cl. 1, affirmed 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231; James J. Stevinson v. United States, 1948, 76 F. Supp. 99, 111 Ct.Cl. 89; East Side Canal & Irrigation Company v. United States, 1948, 76 F.Supp. 836, 111 Ct.Cl. 124.

Plaintiffs acquired their property in 1940 from one Sheppard who had acquired it from Miller & Lux in 1933. Both deeds (Miller & Lux to Sheppard and Sheppard to plaintiffs) contained reservations of water rights in the nature of covenants running with the land. The text of these reservations appears in finding 35.

The reservations made the riparian rights of the land conveyed subordinate to the water rights of the grantor, whether riparian, appropriative, or prescriptive. Plaintiffs' riparian rights were not extinguished, but the covenants were to act as an estoppel in favor of the grantor to the extent of the reservations.

In prior years Miller & Lux and its subsidiary and affiliated companies had built a series of irrigation works upstream from plaintiffs' lands. By virtue of litigation concluded before the conveyance to Sheppard, the appropriations of Miller & Lux and their affiliates had been validated by court decrees. The rights of both Sheppard and the plaintiffs were therefore subordinate to these appropriative and prescriptive rights.

The owners of the prior appropriative and prescriptive rights were entitled to use in one year a maximum of 1,428,074 acre-feet of water. Actually, their highest diversion during the years 1932–1951 was 1,027,180 acre-feet, and the average of their annual diversions during the same period was 870,834 acre-feet. While the flow of the river varied widely from year to year, it usually exceeded the volume of the possible maximum demand. Consequently, there was usually some excess over the water the prior appropriators had any right to demand, and almost always an excess over the actual use of the prior appropriators.

The flow of the river in its natural state has been defined (finding 5) in terms of low, high, and flood stages. During the flood stages of winter and spring the river overflowed even the high channel banks to spread over the upland area. During the river's high stages, but below flood stage, the water was confined to the banks of the high channel. A distinguishable sandy channel marked the flow of the river during its lowest stages. These stages of the river's flow continued to be factors in the diversion and use of the water after the construction of canals and irrigation works by Miller & Lux and others and until the completion of Friant Dam in 1947.

Prior to the construction of Friant Dam, therefore, water from the San Joaquin River reached the lands of plaintiffs in three ways: (1) through the overflow channel, when some of the lands

were submerged by flood waters; (2) through the surface flow of water into the sloughs as part of the high channel of the river during its higher, but not flood stages; and (3) through the underground flow of the alluvial cone, some of which surfaced into and flowed through Salt Slough. At all times material here the only water in Salt Slough during the crucial summer months was return flow of irrigation water that had been distributed to lands upstream during the crop season.

Plaintiffs are not now demanding compensation for loss of either the overflow or the surface flow, as above defined. Their lands were wholly deprived of the overflow in 1947, when Friant Dam was placed in operation. The surface flows were interrupted by the construction of the dam as early as 1944. When the dam was completed, the surface flows, although not stopped entirely until 1951, became dependent upon the timing and quantity of releases by defendant from Friant Reservoir. Ten years elapsed between the completion of Friant Dam and the filing of this action.

Plaintiffs' claims in this action are for the alleged loss, in 1951, of rights in the return flow of irrigation water.

This flow was never stopped. On the contrary, its volume and dependability were enhanced by defendant's substitution in 1951 of the waters of the Sacramento River for San Joaquin waters.

Up to 1951 plaintiffs continued to receive waters from the San Joaquin River. The year 1951 marked the completion of the Delta-Mendota Canal and the beginning of the integrated operation of the Central Valley Project. Whereas Friant Dam had been placed in operation in 1947, and was thereafter used to store waters in Friant Reservoir and to control releases of flows down the San Joaquin River, the integrated operation of the Central Valley Project had to await completion of the Delta-Mendota Canal and its auxiliary pumping stations, so that water from the Sacramento River could be introduced into Mendota pool to sub-

stitute for water from the San Joaquin River, which was thereafter directed to other uses. As a consequence of the substitution, the return flow in Salt Slough after August 1951 consisted of water from the Sacramento River rather than water from the San Joaquin River.

It is this deprivation of San Joaquin water of which plaintiffs complain. Their contention is that their riparian rights depended on San Joaquin water; that the substitution of exchange waters extinguished their riparian rights; and that without such rights, the potential use of their lands was reduced from wet (irrigated farming) to dry (native pasture), with consequent loss of value.

In anticipation of the eventual substitution of waters, defendant, in 1939, had entered into an agreement with Miller & Lux and its subsidiaries providing in detail, first, for the release of water from Friant Reservoir, after the Friant Dam had been completed and until the delivery of substitute water through the Delta-Mendota Canal when that system would become operative, and for continued delivery of this substitute water thereafter. This contract granted defendant the right to continue to store, divert, dispose of and otherwise use the San Joaquin waters theretofore reserved so long as substitute water is delivered in conformity with the contract.

Defendant has faithfully and fully delivered the substitute waters. In fact, the parties have by stipulation agreed that "the supply of substitute water guaranteed to Miller & Lux and its affiliated companies under the exchange contract is far better than the supply * * prior to the construction of the Central Valley Project."

The parties have further agreed by stipulation that "so long as the great area of cropland lying generally to the southeast of plaintiffs' land continues to be irrigated, it is virtually certain that the flows in Salt Slough, [which is upstream from plaintiffs' land] during the irrigation season, will be of the same order of magnitude * * *" as previously. Consequently, there is no foreseeable

prospect of loss by plaintiffs of the physical supply of water, unless, under superior right, the return flow can be diverted or required for other uses.

No such superior right has been asserted against plaintiffs. None has been established under California law. We believe none exists. We conclude, therefore, that plaintiffs are not entitled to recover. On the basis of the evidence in the case and the California cases cited, nothing of substance has been taken from plaintiffs.

Plaintiffs rest their case on the thesis that, whereas they had riparian rights as long as the water came from the San Joaquin River, water from the Sacramento River was foreign water; and under California law, they say, he who discharges foreign waters into a stream may take them away with impunity.

The facts in the California cases cited in support of this foreign waters doctrine are not parallel to those in the instant case. In none of them was there a complete diversion of the natural waters of a stream accompanied by a guaranteed substitution of an equal amount of other waters.

In the absence of a specific ruling by a California court, we cannot accept the application of the foreign water doctrine to the exchange waters of the Sacramento flowing down the channels of the San Joaquin from Mendota pool. These waters of the Sacramento were substituted in consideration of the diversion of the San Joaquin waters. Their substitution was a part of the whole plan proposed by the Secretary of Interior and approved by the President and authorized by Congress. The diversion of San Joaquin waters was authorized only because of the commitment to substitute water from the Sacramento River. We do not believe that the United States could, with impunity, take away the substituted waters.

If, on the facts of the case, the return flow of irrigation water in Salt Slough remains unimpaired in quality and undiminished in quantity and there is no foreseeable prospect of change in that situation as long as the economy of the region continues to obtain; and if, by contract, as well as by law, defendant is committed to supply water to the holders of superior rights from whom plaintiffs derive their return flow, how can they have been damaged?

The trial commissioner of this court, to whom this case was referred for trial, submitted a recommendation for conclusions of law with his report of the facts. In an opinion in support of his recommendation he reasoned that plaintiffs had shown a right to recover because of impairment of the status of their riparian rights, in that "no case has been cited (or found) in which rights in water other than the natural flow have been declared to be riparian." While he questioned whether "plaintiffs, riparians yesterday, are trespassers today, simply because the substitution of waters had the effect of removing one of the traditional ingredients of the legal concept of riparian," he would have given plaintiffs the opportunity to prove, if they could, a diminution of the market value of their lands as a result of this technical impairment.

Plaintiffs are not entitled to compensation for a legal technicality. They must first show that something of substance has been taken from them. Plaintiffs themselves concede as much in their exceptions to the trial commissioner's recommendation. They decline the opportunity the commissioner's solution would have afforded them, to try to prove actual, as distinguished from nominal damages as a result of the substitution of waters. They insist (1) that their riparian rights have been extinguished, and (2) that the measure of compensation is not the diminution in market value resulting from the substitution, but the difference in value between the lands wet and the lands dry.

If they had riparian rights in the return flow,* and if those rights were ex-

---

* Plaintiffs have cited no case upholding their claim to riparian rights in water which was not only subject to superior rights but had actually been used to satis-

tinguished by the substitution of waters, they have, instead, the obligation of the United States to substitute an equal amount of water from the Sacramento. Neither right is superior to the other.

The conclusion follows, as suggested by the trial commissioner, that any impairment there may have been of plaintiffs' rights amounted at most to a technicality. There is no actual damage as a result of the deprivation of the San Joaquin waters and the substitution of the Sacramento waters.

The foregoing analysis is the intention and the obligation derived from the statutes of California and of the United States to prevent such a loss as plaintiffs now claim, through the preservation as far as possible of existing water rights in the course of executing the Central Valley Project.

Before the Central Valley Project was authorized as a undertaking by the United States, a California statute (1933 Cal.Stat. p. 2643, c. 1042) contemplating the project as a State undertaking provided:

"In the construction and operation by the authority of any project under the provisions of this act, no exchange of the waters of any watershed or area for the waters of any other watershed or area may be made by the authority unless the water requirements of the watershed or area wherein such exchange is made are first and at all times met and satisfied to the extent that such requirements would have been met were the exchange not made, and no right to the use of water shall be gained or lost by reason of any such exchange thereof."

Inasmuch as the project was ultimately executed by the Federal rather than the State Government, no occasion has arisen for interpretation of the statute by the California courts. As recently as 1955, however, the Attorney General of the State made an analysis of the statute in which he concluded that the application of the section quoted was limted to the watershed-of-origin of the exchange waters, since the section was part of an act for the protection of watersheds-of-origin. The limited application suggested by the Attorney General would not, however, detract from the manifest intention of the legislature to provide that "no right to the use of water shall be gained or lost by reason of any * * exchange thereof."

The Central Valley Project was taken over and executed by the United States under the Reclamation Act of 1902, as amended, 32 Stat. 388, 43 U.S.C.A. §§ 411, 416, 432, 434. The adoption of the project as a Federal undertaking began with approval by the President of the Feasibility Report by the Secretary of the Interior. Substantial portions of this report (submitted November 26, 1935, and approved December 2, 1935) are set forth in finding 59. Following a description of the general outlines of the project, and a specific reference to the plan to convey Sacramento water up the San Joaquin, the report said:

" * * * This water [referring to water from the Sacramento] will replace San Joaquin River water *now used for irrigation* in the northern San Joaquin Valley, thus permitting the entire flow of the San Joaquin River to be regulated in Friant Reservoir * * * and to be utilized in the southern San Joaquin Valley where local supplies are deficient. * * * " [Italics supplied.]

In every year from 1936 to 1949 the Congress made appropriations for carrying out the Central Valley Project. The project was specifically reauthorized by

fy those rights and remained subject to future curtailment or elimination in the exercise of those rights. If the California courts recognize such a modification of riparianism as is inherent in plaintiffs' claim, they may, when called upon to do so, take the next step and extend riparian rights to the exchange waters.

two of these appropriation acts. (The Act of August 26, 1937, 50 Stat. 844, 850; and the Act of October 17, 1940, 54 Stat. 1198, 1200.)

It is apparent from the foregoing that the President has approved and the Congress has confirmed the commitment by the United States to the obligation to replace the waters of the San Joaquin River with waters from the Sacramento River, and with specific reference to the area of plaintiffs' lands (the northern San Joaquin Valley), which, prior to 1951, was receiving San Joaquin water "now used for irrigation."

The United States cannot withdraw from that commitment with impunity, and neither can it, with impunity, withdraw from any users such as plaintiffs the waters now supplied in substitution for waters formerly originating in the San Joaquin watershed. Any future withdrawal of such waters would render the United States liable to respond with just compensation as fully as defendant would have been responsible to so respond, if it had taken away the natural waters without making an equivalent substitution therefor.

There has been no taking of plaintiffs' rights for which just compensation has not been made.

Plaintiffs' petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and LITTLETON, Judges, concur.

## Findings of Fact

The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:

*Contents*         *Findings*

I. The San Joaquin River and Its Flood Plain .................................. 1–6
II. Defendant's Plan for Utilization of the Water ................................. 7–9
III. Appropriative and Prescriptive Rights... 10–21
IV. The Return Flow of Irrigation Water.... 22–23
V. The Execution of Defendant's Plan ..... 24–33
   A. Purchase of the Rights of Miller & Lux and Others ............... 24–25
   B. The Agreement for the Exchange of Waters ........................ 26–27
   C. Construction of Works and Impounding of Water .............. 28–33
VI. The Plaintiffs' Land and Its Water Supply ................................... 34–43
   A. Reservations of Water Rights by Miller & Lux ..................... 34–35
   B. Acquisition of Lands by Plaintiffs 36–37
   C. Water Rights at the Time of Acquisition ......................... 38–39
   D. Water Supplies: Before and After 40–43
VII. The Uses of Plaintiffs' Lands ............ 44–52
   A. Physical Aspects of the Lands .... 44
   B. Actual Uses ........................ 45
   C. Potential Uses ..................... 46–52
VIII. The Plaintiffs' Legal Rights ............. 53–58
IX. Miscellaneous ............................. 59–69
   A. The Feasibility Report ............. 59
   B. Appropriation Acts ................. 60
   C. Details of Haines Decrees ......... 61
   D. Diversions by Miller & Lux and Others ........................... 62–64
   E. Discharges of the River ........... 65
   F. Statistics of Friant Dam ......... 66
   G. Miller & Lux Reservations ........ 67
   H. Legal Descriptions of Plaintiffs' Lands ............................. 68
   I. Return Flows in Salt Slough ...... 69

## I

## The San Joaquin River and Its Flood Plain

1. The Central Valley of California, approximately 450 miles in length, lies between the Sierra Nevada Mountains on the east and the coastal ranges on the west. The northerly two-fifths of the valley is drained by the Sacramento River system, and the southerly three-fifths is drained by the San Joaquin River system. The Sacramento River flows southerly and the San Joaquin flows northwesterly. Both empty through the same delta into Suisun Bay, an arm of San Francisco Bay. The controversy in this case centers around rights to the use of water of the San Joaquin River.

2. The San Joaquin River is a natural watercourse, with well-defined channels and banks and with its source in the Sierra Nevada Mountains. It flows thence westerly to the plains of the San Joaquin Valley, which it enters at a point known as Friant, the site of defendant's storage and diversion dam, whose effect upon the waters of the river is the basis of plaintiffs' claims in these actions. From this point, the river continues west-

ward approximately 62 river-miles to a point in the valley near the town of Mendota, where it is joined by the Fresno Slough of Kings River. It then turns abruptly toward the north and flows in a northwesterly direction until it reaches San Francisco Bay.[1] Certain tributaries empty into the San Joaquin between Friant and the lands of the plaintiffs and contribute water in varying amounts to the river's flow. Certain other streams empty into the San Joaquin downstream from the plaintiffs' lands.

3. In its course through the mountains and foothills and for some distance after it reaches the valley floor, the banks of the San Joaquin are so high as to preclude overflow, but after the river reaches a point known as Gravelly Ford, about 27 miles west of Friant, the banks become relatively low. In a state of nature and during periods of high or flood water, the river flowed out of its banks at places below this point and over and upon certain of the lands on either side of the river, either directly or after flowing into sloughs or branch channels. In the area of such overflow, the river flowed through numerous side channels, branch channels, and reaches of backwater, in addition to the main channel, such extra channels being referred to generally as sloughs. Some of the sloughs form networks; some have dead ends; some receive only backwater, and some receive water from the river and return it to the river at lower points, either directly or through connecting sloughs. Some sloughs branch off other sloughs. Some carry river water whenever there is water in the main channel; others carry river water only at higher river stages.

4. The natural flow of the river has been and is variable in quantity, both over the years and in periods within the years. In the spring and summer the river is fed by the melting snow pack of the Sierra Nevada Mountains and in the winter season by rainfall, supplemented by a small amount of snow-melt in the lower reaches of the mountains. As a result there have been two periods of high water, the winter rain flood usually in December, January, and February, and the spring or summer snow-melt overflow usually in April, May, and June, with considerable variance in the times of commencement, duration, and the times of peak flow.

5. In the vicinity of plaintiffs' lands the river, in a state of nature and at the lowest stages of flow, was confined by natural banks to a sandy channel. This channel, except during stages of higher flow, hereinafter described, contained the water flowing in the river and is referred to as the low channel. Plaintiffs' lands are located from two to three miles from the low channel of the San Joaquin River.[2]

At higher stages of the river in every year of ordinary flow, the waters spread further, and for a time were confined to a wider channel by such natural banks. This wider channel is referred to as the high channel.

In every year of ordinary flow in a state of nature the river rose still higher, so that its waters were no longer confined to the high channel. The waters so overflowing the high channel banks and into and over the upland area moved slowly in the same general direction as the flow of the river in the low and high channels. This wide overflow was confined by rising ground on each side of the general overflow basin of the river. This is referred to as the overflow channel.

1. For the purposes of this case it is convenient to think of the river in three segments: (1) the mountain watershed above Friant; (2) the drainage basin from Friant downstream to Mendota; and (3) the drainage basin below Mendota.

2. Plaintiffs' lands are in Merced County, as were those of the Gerlach Live Stock Company and related claimants (see Gerlach Livestock Company v. United States, 76 F.Supp. 87, 111 Ct.Cl. 1) and James J. Stevinson and related claimants (see James J. Stevinson (a Corporation) v. United States, 76 F.Supp. 99, 111 Ct.Cl. 89). These cases were decided in 1948. The Gerlach decision by the Supreme Court is reported in 339 U.S. 725, 70 S. Ct. 955, 94 L.Ed. 1231. It was decided in 1950.

The flood plain (subject to overflow) extends approximately from Gravelly Ford to a point below the confluence of the San Joaquin with the Merced.[3]

6. While the Sacramento River has an annual runoff that is approximately twice that of the San Joaquin River, about three-fifths of the land in Central Valley is accessible only to the San Joaquin. As a result, much of the water of the Sacramento River, prior to the construction of the Central Valley Project, was dissipated needlessly into San Francisco Bay while large areas of fertile land in the southern part of the San Joaquin Valley remained undeveloped for lack of water. The State of California devised a plan under which the waters of the valley would be captured and used to greater advantage, which plan, although never carried out by the State, was subsequently taken over by the United States and became what is known generally as the Central Valley Project.[4]

## II

### Defendant's Plan for Utilization of the Water

7. The plan as formulated by defendant involved the irrigation of a large area of privately owned land nonriparian to the river situated both to the north and south of Friant in the California counties of Madera, Merced, Fresno, Tulare, Kings, and Kern. The plan contemplated, among other things, the construction of a dam across the San Joaquin River at Friant, forming a reservoir. It contemplated the construction of two canals, one with a capacity of 1,000 cubic feet per second, referred to later as the Madera Canal, running north from the reservoir to the county of Madera, and another with a capacity of 3,500 cubic feet per second, referred to later as the Friant-Kern Canal, reaching south from the reservoir to the counties of Fresno, Tulare, Kings, and Kern. Except for occasional spills to provide reserve storage capacity for the purpose of flood control, the reservoir and canals were planned with capacity to store and divert substantially all the water customarily flowing in the San Joaquin River at Friant. Details of the plan were set forth in a letter dated November 26, 1935, addressed to the President by the Secretary of the Interior. The President approved the plan on December 2, 1935. Substantial portions of the letter are set forth in finding 59.[5]

8. The plan has been altered in a number of respects since it was approved by the President. Among other things, the height of the Friant Dam was increased from 250 feet to 320 feet, enlarging the storage capacity from 400,000 acre-feet to 520,000 acre-feet. The proposed pumping system, which would have conveyed Sacramento River water up the bed of the San Joaquin River by means of natural and artificial channels and works in a series ending at the mouth of the Merced River, has been supplanted by another which pumps Sacramento River water from the delta into the Delta-Mendota Canal, to be carried thence by gravity south to Mendota. The capacity of the Friant-Kern Canal has been increased from 3,500 to 4,000 cubic feet per second.

3. For a terse description of the geological development of alluvial cones, with their underground aquifers, resulting from periodic floods, and of their early economic consequences, see Fifty Years of Water Law, 50 Harv.Law Rev. 252, 254–256.

4. Plaintiffs predicate their claim in this case on the Friant project, which, the Supreme Court has said, was authorized under the Reclamation Act of 1902. United States v. Gerlach Live Stock Company, 1950, 339 U.S. 725, 739, 70 S.Ct. 955, 94 L.Ed. 1231. The Reclamation Act precludes interference with State laws relating to water rights. 32 Stat. 388, 390, 43 U.S.C.A. § 383. For the relation of California legislation (adopted in contemplation of development of the Central Valley Project by the State) to rights under the project as developed by the United States, see Rank v. Krug, D.C.1956, 142 F.Supp. 1, 149–154.

5. The significance of the letter is that it comprises the Feasibility Report, approval of which was requisite to authorized procedure under the Reclamation Act. Cf., Rank v. Krug, D.C.1956, 142 F.Supp. 1, 96.

Due primarily to the exigencies of the Second World War, substantial portions of the project were not completed on schedule, but, with some modification, defendant's original plan has continued as the plan of defendant, and has been carried out by the construction of Friant and Shasta Dams, the canals known as Madera, Friant-Kern, and Delta-Mendota, and other features. Congress has appropriated large sums of money to finance the work.[6]

9. (a) Defendant's plan, as modified contemplated among other things, that the United States should eventually store and divert to nonriparian use the waters of the San Joaquin River originating above Friant Dam and formerly flowing at or below Gravelly Ford, except for releases from Friant which would be for one or more of three purposes: (1) to satisfy riparian rights between Friant and Gravelly Ford; (2) to reserve vacant storage space in the reservoir in the exercise of flood control, and (3), to supply, when available, water to meet the requirements of the contract for exchange of waters referred to in finding 26. The exchange waters are primarily supplied through the Delta-Mendota Canal. In normal, contemplated operation, releases for purposes (2) and (3) above would not provide an adequate or a dependable source of water to fulfill the exchange contract or for the irrigation of riparian land below Gravelly Ford.

(b) The plan contemplated that defendant should acquire or provide and maintain a substitute supply for all existing rights to the use of San Joaquin water originating above Friant Dam and formerly flowing at or below Gravelly Ford. Such rights were of three classes: (1) use of the water for production of cultivated crops; (2) use of the water for irrigation of controlled grasslands under appropriative or riparian rights; and (3) the riparian right to the flow of the river for the irrigation of other riparian lands, watering of livestock, and domestic purposes.

(c) Defendant's plan contemplated that compensation for the acquisition of the right to the use of water on croplands at or below Mendota Dam to approximately the mouth of the Merced River would be made by providing a substitute supply of water from the Sacramento River through the pumping system. Pending the construction and completion of the pumping system, the plan contemplated that sufficient water would be released from the Friant Reservoir to meet the requirements of the cropland rights.

The plan contemplated that the rights of the second and third classes enumerated in paragraph (b) above were to be purchased or otherwise acquired by the defendant.

III

Appropriative and Prescriptive Rights

10. Miller & Lux, Incorporated,[7] a Nevada corporation doing business in California, and certain of its subsidiary and affiliated companies were, prior to the construction of the Central Valley Project, the owners of rights to the use of a very substantial portion of the flow of the San Joaquin River.

11. Beginning about 1870 and continuing over a course of years, Miller & Lux and certain subsidiaries or affiliated companies constructed a series of control works along portions of the San Joaquin River and its sloughs. These physically changed to some extent the state of nature, so that as operated and maintained by Miller & Lux the overflow from the river and some of the sloughs was modified as to some of the land.

Prior to any of the times here involved, Miller & Lux had become the owner of large areas of land, beginning with a narrow strip at Gravelly Ford and extending in varying widths down the San Joaquin Valley to approximately the junction of the Merced River with the San Joaquin River, among which lands were those of the plaintiffs, who acquired their lands

6. Specific appropriation and authorization acts are listed in finding 60.

7. Hereinafter referred to as Miller & Lux.

from Miller & Lux by a mesne conveyance. Large portions of the lands owned by Miller & Lux, including portions of those of the plaintiffs herein, were riparian to the San Joaquin River, or to sloughs or branch channels thereof, and in some instances to both.

12. (a) At the respective times here involved, San Joaquin & Kings River Canal & Irrigation Company (whose rights were later acquired by the Central California Irrigation District), Gravelly Ford Canal Company, Columbia Canal Company, Firebaugh Canal Company (formerly Panoche Canal Company), and San Luis Canal Company were corporations.

(b) Prior to any of the times here involved, such corporations, with the consent of and under agreements with Miller & Lux constructed certain canals and works and thereby diverted and appropriated large quantities of the water of the San Joaquin River for the irrigation (1) of lands riparian to the San Joaquin River owned by Miller & Lux, and (2) of lands nonriparian to the San Joaquin River owned (i) by Miller & Lux and (ii) by other persons.

(c) Also prior to any of the times here involved and in addition to the foregoing diversions, Miller & Lux constructed certain canals and works and thereby diverted and appropriated waters of the San Joaquin River for the irrigation of lands owned by it, both riparian and nonriparian to the San Joaquin River.

13. (a) A large part of the water so diverted and appropriated by Miller & Lux and by the companies named in finding 12 (a) was appropriated and diverted and was used for the irrigation of croplands. A large part also was diverted and appropriated and was used for the purpose of irrigating grass or pasturelands through the medium and under the control of canals, ditches, levees, and other works. Such grasslands were referred to as controlled grasslands. Some of these lands, including portions of the lands of plaintiffs, were riparian to the San Joaquin River or to sloughs or branch channels thereof. Miller & Lux

applied water to those controlled grasslands only during periods when flows were in excess of the amounts that could be used beneficially on croplands.

(b) In addition to the croplands and controlled grasslands so irrigated, Miller & Lux owned lands of another character riparian to the San Joaquin River, its branches and sloughs. During the periods of spring and winter high water or floods, at times of normal or greater than normal flow, the waters of the San Joaquin River flowed by and over and upon such grasslands by means of the main channel, and branch channels and sloughs, and moistened such lands and provided water for cattle and other livestock. Lands so watered were referred to as uncontrolled grasslands.

14. In the early 1920's, Miller & Lux and two of its affiliated companies commenced three actions in the Superior Court of the State of California in and for the County of Fresno. In one of the actions, No. 25729, Miller & Lux Incorporated was plaintiff, and Madera Irrigation District and certain individuals were defendants. A decision, consisting of findings of fact and conclusions of law, was rendered in that case on January 4, 1933, and a decree was entered in accordance with such decision on January 26, 1933. In the second action, No. 25730, the San Joaquin & Kings River Canal & Irrigation Company, Incorporated (successor to San Joaquin & Kings River Canal & Irrigation Company) was plaintiff, and Madera Irrigation District and certain individuals were defendants. A decision was rendered in such action on January 4, 1933, consisting of findings of fact and conclusions of law, and a decree was thereafter entered in accordance with such decision. In the third action, No. 25731, San Luis Canal Company, a corporation, was plaintiff, and Madera Irrigation District and certain individuals were defendants. A decision in this case was rendered December 31, 1932, and a decree was thereafter entered in accordance with such decision. These decisions and the decrees entered upon them are referred to herein as the Haines decrees, so

called because they were rendered by Honorable Charles C. Haines, Judge of the Superior Court.

15. (a) The Haines decrees [8] adjudicated that Miller & Lux and its affiliated companies had appropriated certain quantities of water for the irrigation of the land there involved, including cropland and controlled pastureland; that such diversion, appropriation, and use had continued adversely to all the world for more than five years; that Miller & Lux and its subsidiaries had acquired thereby a prescriptive right to the use of the water so appropriated; and that Miller & Lux and its subsidiaries were the owners by prescription and appropriation of the rights so defined in the decrees. These rights were expressed in terms of cubic feet per second,[9] but, except in two instances, with a limitation as to the total diversion in terms of acre-feet per year.[10]

(b) For a long time prior to the construction of the Central Valley Project there existed a number of appropriative and prescriptive rights which were entitled to be satisfied out of the waters of the San Joaquin River flowing past Friant. Some of these (1) were so entitled apart from agreement or covenants or reservations and conditions in deeds (including those hereinafter mentioned) and (2) were adjudged by the Haines decrees to be owned by Miller & Lux and certain other corporations; and some were owned by other diverters.[11]

(c) All of the appropriations described in this finding were upstream from the lands of plaintiffs. The rights thereto were valid and subsisting as of the date of the Haines decrees. There has been no change in their number or magnitude between the date of the Haines decrees and the present, except that certain of them have been acquired by the United States in whole, in part, or on condition, with consequent changes in points of diversion and place of use. The appropriative and prescriptive rights described in this finding were entitled to receive, in the aggregate, a maximum annual flow of 1,428,074 acre-feet.

16. (a) Prior to the construction of the Central Valley Project there were also lands irrigated by water taken from the San Joaquin River between the head of the Gravelly Ford Slough and Friant Dam. These rights were riparian rather than appropriative or prescriptive rights and amounted in the aggregate to 30,464 acre-feet per year.

(b) In the Haines decree the Madera Irrigation District was held to be entitled to appropriate water from the San Joaquin River when the flow at Friant exceeded 20,000 second-feet or the yearly runoff exceeded 3,000,000 acre-feet. No water was ever diverted from the San Joaquin River by the Madera Irrigation District under such right.[12]

17. During the period from 1895 to 1928, Southern California Edison Com-

8. The material appropriative rights adjudicated in the Haines decrees are identified and the maximum quantities to which they were adjudged to be entitled are set forth in finding 61.

9. A cubic foot per second, also called a second-foot, is the rate of discharge flowing in a channel of a rectangular cross-section one foot wide and one foot deep at an average velocity of one foot per second. Water flowing at the rate of one cubic foot per second for 24 hours will produce a volume of water equal to approximately 2 feet in depth covering one acre, to two acre-feet.

10. The descriptions by which these appropriative and prescriptive rights are known, with the maximum rates of flow and maximum quantities of water, are included in the list of appropriate rights set forth in finding 62.

11. The names by which the rights of other diverters are identified and the limits of such rights are set forth in finding 61 (b).

12. Based upon 34 years of record, from 1910 to 1943, inclusive, the total runoff of the river exceeded 3,000,000 acre-feet in the years 1911 and 1938, and the river exceeded 20,000 second-feet for eight days in 1911, one day in 1914, two days in 1937, and ten days in 1938, giving a yearly average of 36,853 acre-feet for the 34 years in question available for the satisfaction of these rights, provided such flows could have been beneficially used at the times available.

pany and San Joaquin Light and Power Corporation, or their predecessors, constructed dams and reservoirs in the San Joaquin River Basin above Friant and stored water in the reservoirs and released and regulated the flow of the waters through a series of power plants. Beginning in 1906, Miller & Lux and its subsidiaries entered into numerous contracts with the two power companies or their predecessors, by the terms of which it was agreed generally that, subject to certain limitations as to times and quantities, the two companies might store waters of the San Joaquin River system during comparatively high stages of the flow, and use the stored water for the production of power and return it to the river above the lands owned by Miller & Lux during lower stages of the flow.

The effect of such operations was to reduce the amount of the flow in periods of high water and to increase the amount of the flow during periods of low water. As new reservoirs were put into operation during these years, the regimen of the river below Friant was materially and progressively altered. The relative rights of the plaintiffs to the use of the waters of the San Joaquin River are limited to the flow of the river as altered by operations of the power companies under the agreements above mentioned.

18. The records of water actually diverted show that Miller & Lux and its affiliated companies did not divert and put to use in any one year as much water as the 1,428,074 acre-feet authorized by the appropriative and prescriptive rights described in finding 15.[13] The maximum yearly diversion during this period was 1,027,180 acre-feet in the year 1932, and the average diversion over the 20-year period 1932–1951 was 870,834 acre-feet.

19. (a). Yearly discharges of the San Joaquin River at Friant varied widely in volume from the highest year, 1886,

to the lowest, 1924. By ten-year periods (from 1897 to 1955),[14] the average yearly discharge varied from a high of 2,210,044 acre-feet to a low of 1,286,200 acre-feet, with a mean for the six decades of 1,712,867 acre-feet. During each of such ten-year periods, the discharges for separate years varied widely. Actually, there were few years when the discharge was approximately that of the yearly average. In many years the excess over the yearly average was quite high while in many years there was a deficiency. In some of the low years the discharge was less than the aggregate of maximum diversions to which all appropriators were entitled.

(b) The discharge is not uniform throughout a year, nor do the relative discharges for the months within the year remain constant. The highest monthly discharge during the year usually occurs in May or June, although occasionally it occurs in April.[15] An average of monthly percentages based on 39 years (1905–1943) shows discharges of 21 percent in May, a like amount in June, and 13 percent in April, thereby accounting for 55 percent of the yearly discharge in these three months. For the crucial irrigation months of July, August, and September, the total shown by these averages was 18 percent (11 percent in July; 4.4 percent in August; and 2.6 percent in September).

20. (a) As the flows actually occurred, there were times of the year when, as a matter of right, the owners of appropriative and prescriptive rights, without reaching or exceeding their maximum limits in cubic feet per second, diverted all of the water of the stream. At other times, the discharge exceeded the capacity of the diversion works of such appropriators and their requirements for use, as well as exceeding the maximum limit in cubic feet per second under their rights.

13. Their diversions in the period 1932–1951 are shown in the tabulation set forth in finding 62.

14. A tabulation of yearly averages for these six decades is set forth in finding 65(a).

15. A tabulation of the yearly cycle, comparing the year 1945 with the period 1905–1943, is set forth in finding 65(b).

The records of diversions show that there was a period in most years, usually commencing in October, November, or December, and ending the next summer, when there was an excess of water over the requirements of all appropriative and prescriptive rights.[16] Generally, this period commenced just after the beginning of the winter rains, when the discharge of the river was relatively low, but the demand for water was even lower. The excess of supply over demand continued through the rising volume of discharge caused by the winter and spring floods. It continued through the peak of the spring floods and was cut off when the high discharges from the spring floods began to subside.

(b) In order to achieve the most beneficial use of the water throughout the irrigation season agreements were reached between the owners of several of the appropriative rights under which diversion or flow schedules were set up allocating the water in the river during each month by reference to the river stage at Friant. The principal agreement was executed on July 18, 1933, between Miller & Lux, the San Joaquin & Kings River Canal & Irrigation Company, the Edison Securities Company, and the Columbia, San Luis, and Firebaugh Canal Companies. The flow schedule contained in that agreement was approved by the State Railroad Commission and has been in use since that time.

This flow schedule was later expanded to include the several grassland rights as determined and limited by the Haines decree. Grassland rights is the term generally used to describe the appropriative and prescriptive rights owned by Miller & Lux and its subsidiary companies and used by them for the irrigation of controlled grasslands as distinguished from croplands. The expanded schedule is included as Table 3 of Report No. 3 of the Water Project Authority of the State of California.[17]

21. (a) The diversions by Miller & Lux and its affiliated companies mentioned above were all upstream from the lands of plaintiffs. The greater part of the water so diverted was (and continues to be) diverted by means of two dams across the San Joaquin River.

(b) Mendota Dam was originally built in 1871 by the San Joaquin & Kings River Canal & Irrigation Company, under contract with Miller & Lux, for the purpose of diverting San Joaquin water into several large canals heading immediately above the dam, and has been progressively maintained, improved, and replaced by the San Joaquin & Kings River Canal & Irrigation Company for that purpose ever since. It was not built for and is not used for storage purposes. As an incident to raising the level of the water for the purpose of diversion, a certain amount of channel storage resulted. The amount of water thus stored was never more than a relatively negligible amount, and it was not utilized as stored water, or for any purpose other than maintaining the level necessary for diversion. Diversions were also made by Miller & Lux through other canals and sloughs.

(c) Sack dam, located about 19 miles downstream from Mendota, was not a permanent structure. It was reconstructed each year, most often in mid-July, sometimes earlier and sometimes later, whenever the flow of the river dropped below an amount equal to or less than the requirements of the croplands irrigated by the canal companies. The dam remained in place until the major portion of the irrigation season had passed, at which time it was removed, usually in October, November, or December. During the period when the dam was installed there was virtually no direct flow in the river below the place of installation.

---

16. According to the 39-year average referred to in the preceding finding, the total discharge for the six-month period October to March was a bare 26 percent of the yearly total. This is some indica-

tion of how scant was the demand during the fall and winter months.

17. Maximum rates of diversion as derived from this table are set forth in finding 63.

## IV

### The Return Flow of Irrigation Water

22. Water used in the irrigation of croplands is not wholly consumed in the irrigation process. The portion not consumed, except for a small amount lost in evaporation, reappears in the sloughs and in the river, downstream from the irrigated land and is known as return flow. This return flow derives principally from three sources:

(1) Of the water that is actually applied to the land to be irrigated, a small portion is lost in evaporation, and another part seeps through the soil and is consumptively used by the crops. It is not possible, however, to apply exactly the amount of water needed to thoroughly wet the earth down to the bottom of the root zone and no further. In order to insure that the crops have enough water, more than is needed for plant consumption and evaporation allowance must be applied, and the excess percolates down until it reaches the top of the ground water table. The ground water table in this area is very close to the surface, in some cases as little as two feet. The ground water table slopes generally in the same direction as the river, and the movement of the ground water is in the same general direction.[18] When the ground water encounters sloughs or drains that are below the top of the water table, the water drains into these channels, thereby reappearing as surface water and as one element of the return flow.

(2) A second element of the return flow consists of what is sometimes referred to as tail water drainage of the irrigated cropland. Apart from the fact that more water must be allowed to percolate through the soil than is needed for the consumptive use of crops, it is also not possible to divert onto the higher end of the field that is to be irrigated so precise an amount of water as to leave no surplus available at the lower end of the checks over and above the water that percolates

into the soil. This surplus must be drained off if the crops at the lower end of the field are not to be damaged. It is carried off through the drains and ultimately finds it way into the sloughs and into the river downstream of the irrigated land.

(3) Finally, in the operation of a large distribution system it is not possible to schedule the deliveries of water to the various owners of irrigated land that are served by the canal with such precision that the entire amount diverted from the stream is always fully used; or, stated another way, so that there is never flowing in the canal, at or about the downstream end of its service area, an amount of water sufficient to supply only those lands in that area and no more. There must always be some surplus. These surplus waters are referred to as the operational spill of the canal system. They are allowed to drain off and constitute the third element in the return flow.

23. The ratio between the amount of water actually used by the crop and the amount of water that is applied to the lands to be irrigated is known as the irrigation efficiency. An excellent irrigation efficiency would be of the order of 70 percent. In the area of the San Joaquin Valley with which this case is concerned the irrigation efficiency is something less than 70 percent; possibly as low as 50 percent. Thus, between 30 and 50 percent of the water that is applied to the land is not consumed by the crops to which it is applied.

Not only is a 100 percent irrigation efficiency impossible of fulfillment as a practical matter, but it would, if achieved, constitute a destructive irrigation practice. All of the water used for irrigation purposes contains a certain percentage of salts. It is desirable, if not necessary, to maintain what is termed the salt balance of the area. This means that the total amount of salt being brought into an area that is being irrigated must be compensated by the amount of salts taken out of the area. If it were possible to re-

18. Cf. footnote 3, for references to the alluvial cone and underground aquifers which explain the mechanics of this hydrologic phenomenon.

use and recirculate irrigation waters so that there was practically no return flow, this would necessarily result in a gradual build-up of the salts in the area which would ultimately decrease production and possibly even destroy the land. In the San Joaquin Valley, and particularly in the area near Los Banos, there is a wide awareness of this problem and of the necessity that drainage water be allowed to flow out of the area that is being irrigated.

## V

### The Execution of Defendant's Plan

#### A. Purchase of the Rights of Miller & Lux and Others

24. (a) Promptly after the approval of its plan (in December 1935: finding 7), defendant proceeded to ascertain the extent of the water rights to be purchased [19] and the compensation to be paid therefor, and for that purpose an appraisal board was appointed.[20] Attorneys for the United States Reclamation Bureau instructed the board as to the extent of such water rights.

The board appraised the controlled grassland rights and the riparian rights of Miller & Lux and its subsidiaries, and on July 27, 1939, the defendant and Miller & Lux and its subsidiaries entered into a written contract whereby Miller & Lux and its subsidiaries agreed to relinquish or convey to defendant all their rights to the use of the water of the San Joaquin River, except and in excess of specified rates of flow deemed to be equivalent in quantity to their existing water supply under rights for the irrigation of croplands.[21] In consideration, the defendant agreed to pay to Miller & Lux and its subsidiaries the sum of $2,450,000 for the water rights so to be conveyed.

(b) On September 14, 1939, Miller & Lux and Gravelly Ford Canal Company made, executed, and delivered to defendant a conveyance of the rights described in the agreement dated July 27, 1939, being rights appropriative and riparian in origin for water not used for the irrigation of croplands.[22]

(c) The volume of water, in terms of yearly aggregate, reserved by Miller & Lux in the contract of July 27, 1939, has been computed [23] to be 1,056,340 acre-feet.[24]

25. Defendant also negotiated with other owners of appropriative and riparian rights in the San Joaquin Valley to acquire the water that those owners had the right to use. In some cases these negotiations resulted in settlements by which a supply of substitute Sacramento water was made available to the owners of these rights. Other owners filed suit in the Court of Claims and were awarded damages for the loss of their rights to the use of water occasioned by the construction of the Central Valley Project.

---

19. Described in finding 9 as (1) water for the irrigation of controlled grasslands under rights appropriative and riparian and (2) water used for watering livestock and for domestic purposes under miscellaneous riparian rights.

20. The board consisted of Messrs. A. B. Etcheverry, F. C. Hermann, and Curtis Walker.

21. The rates of flow specified in the contract as being reserved by Miller & Lux were mean daily flows in cubic feet per second. These rates, by months, are listed in finding 64.

22. It is not possible, from the data in evidence, to relate the rights so conveyed more specifically to kind, or to volume of water.

23. Computed from the table in finding 63 on the basis of 2 acre-feet per day for one second-foot of flow and estimating the Chowchilla Canal right at 49,300 acre-feet.

24. Cf. finding 15(c) showing aggregate appropriative and prescriptive rights to an annual flow of 1,428,074 acre-feet; finding 18, showing a maximum diversion in one year of 1,027,180 acre-feet and a 20-year average diversion of 870,834 acre-feet; and finding 19(a), showing annual discharges of the river at Friant of the average order of 1,700,000 acre-feet.

## B. The Agreement for the Exchange of Waters

26. (a) On the same day [25] that Miller & Lux and its subsidiaries and the defendant made the agreement for the sale and purchase of the controlled grassland and riparian rights, they entered into a further agreement, referred to as the contract for exchange of waters. This agreement provided in detail for the release of water from Friant Reservoir and for the delivery of substitute water through the Delta-Mendota Canal when that system would become operative.

(b) Under date of June 1, 1955, the exchange contract was superseded by an amended contract for exchange of waters, which states that since approximately July 16, 1951, the United States has been storing and diverting the waters of the San Joaquin River reserved by Miller & Lux and its affiliated companies in the purchase contract (referred to in finding 24) in order to enable other parties to use them within and without the watershed of the San Joaquin River and that the United States has been and is supplying Miller & Lux, in lieu of such waters, with substitute water from the Sacramento River through the Delta-Mendota Canal. The contract goes on to grant to the United States the right to continue to "store, divert, dispose of and otherwise use, within and without the watershed of the San Joaquin River, the aforesaid reserved waters" so long as substitute water is delivered in conformity with the contract (Article 12). The amount of substitute water required to be delivered is fixed by reference to the computed natural inflow to Shasta Lake (Articles 15 and 16).

27. The supply of substitute water guaranteed to Miller & Lux and its affiliated companies under the exchange contract is far better than the supply which they enjoyed prior to the construction of the Central Valley Project. Prior to the construction of the project the yield of the water rights of the four affiliated companies in the month of August, one of the critical months of the irrigation season, varied from 11,400 acre-feet in the driest year of record to 118,500 acre-feet in the wettest year of record. The median amount was about 69,000 acre-feet. The original exchange contract guaranteed delivery of such quantity of water as the canal companies would have had in the absence of the operation of the Central Valley Project but with provision for a minimum amount of 93,000 acre-feet of water. Under the provisions of the amended contract the minimum supply guaranteed in the month of August was increased to 126,000 acre-feet except in the case of very dry years.

## C. Construction of Works and Impounding of Water

28. Friant Dam is a straight gravity concrete dam. Its total length at the top is 3,430 feet, and the maximum height is 320 feet. Across the top of the dam is a roadway whose elevation above mean sea level is 583 feet.[26]

The only openings extending entirely through the dam are those hereinafter mentioned. The first is the spillway at the top of the dam which is controlled by three drum gates. These drum gates are large steel cylinders, each 100 feet long and 18 feet in diameter, which float up and down in a chamber at the bottom of the spillway opening and are raised and lowered by the water let into and released from the chamber. By increasing the amount of water in a chamber each gate floats up, closing, to the extent desired, the opening which the particular gate is to control. By reversing the process the gate goes down. It can be adjusted and held to any point. When the gates are raised to the designed maximum elevation, the maximum water surface is at elevation 578.[27] When the gates are completely lowered, the maxi-

25. July 27, 1939. Finding 24(a).
26. Other statistics relating to height and elevation are listed in finding 66.
27. Unless otherwise specified, all the elevations given in connection with the openings hereinafter mentioned are the elevations at the upstream face of the dam and relate to mean sea level.

mum water surface is at elevation 560, except for the head required to flow the water over the spillway. The drumgates were intended to be installed in 1942, but due to the advent of war in 1941, progress in that connection was halted. They were installed on October 31, 1947.

The next lower opening is the outlet to the Friant-Kern Canal at the south side of the dam. The center line of the outlet is at elevation 464.

The next lower opening is the outlet to the Madera Canal at the north side of the dam. The center line of the outlet is at elevation 446.

Next are four openings referred to as the permanent river outlets, all on the same level. The inverts, the lowest points in the cross sections of the openings, are at elevation 375.42.

The next were three temporary openings, used during construction to permit the water of the river to pass, but which were later filled with concrete. The floors of those openings were at elevation 316.

The normal low-water surface of the river prior to the construction of the dam was at elevation 305.6.

29. The contract for the construction of the dam was awarded on October 9, 1939, and construction was commenced on November 3, 1939. In the early stages of construction, and prior to March 6, 1941, the water of the river was carried over the foundation of the dam in a wooden flume. The floor of the flume was 4.4 feet above the normal low-water surface of the river. The amount of water impounded by reason of this difference is not disclosed. At one time while the flume was being used to pass the water, some high water exceeded the capacity of the flume, backed up behind the dam, and flooded the works. This flooding was not an intended consequence of the work, although a calculated risk.

30. The concrete work of the dam was divided into sections, referred to as blocks, numbered consecutively from one end of the dam to the other. As the concrete work progressed, three temporary openings, each 14 feet square, were left in the base of the dam through blocks 37, 39, and 41. The elevation of the floors of these openings at the upstream face was 10.4 feet above the normal low-water surface of the river. When use of the wooden flume was discontinued and the river was diverted through these temporary openings, there was a permanent impounding of water immediately behind the dam to a depth of not less than 10.4 feet. The number of acre-feet impounded is not known, but was negligible.

During the late summer or early fall of 1941, the water was cut off from the temporary opening in block 41 and was carried through the temporary openings in blocks 37 and 39. Steel gates, in the nature of a headworks structure, then were firmly installed at the upstream end of the temporary outlet through block 41. Next, steel gates were similarly installed in the temporary outlet through block 39. After the gates were installed and in good operating condition, all the water was passed through the gate-controlled openings through blocks 39 and 41, and the outlet through block 37 was completely filled with concrete and permanently sealed off against further passage of water.

As the natural flow decreased with the season, the outlet through block 39 was cut off, all the water was passed through the gate-controlled temporary opening through block 41, and the opening through block 39 was filled with concrete and permanently sealed. That left only the temporary opening through block 41 open and in operation.

31. Prior to October 20, 1941, the concrete work in the dam had been completed to a point above elevation 400, but not as high as the elevation of the designed outlet into the Madera Canal. On or about that day, the gates in the temporary outlet through block 41 were partially closed for the purpose of impounding water and at the same time allowing the passage of approximately the amount of water required to be released under the agreement of July 27, 1939, with Miller & Lux and its subsidiaries. This operation raised the surface of the water in the reservoir until, on November 11, 1941,

the water reached elevation 375.42 [28] and commenced to spill through the permanent river outlets.

The water was then cut off from the temporary outlet through block 41, and the work of permanently sealing that outlet was begun. The sealing was completed in about five months. Except for the amount approximately equaling the quantities reserved by Miller & Lux and its subsidiaries, no water passed the dam between October 20 and November 11, 1941.

When the water was cut off from the last temporary opening and the opening was sealed, the water below the inverts of the permanent river openings was permanently impounded, with no means left for its release. The amount so impounded was approximately 17,400 acre-feet.

32. The permanent river outlets were designed to be controlled by needle valves. Defendant had been taking steps preliminary to the purchase of the valves when the international situation became so bad, and demands for materials for defense purposes became so great in the fall of 1941, that the valves could not be obtained. Except for the emergency and for the ensuing war, the valves to control the permanent river outlets would have been installed in the year 1942.

In the fall of 1941 the Madera Canal had been constructed to the extent of about 7 miles, but had not yet been completed. Construction of the Friant-Kern Canal had not been commenced.

For a short time in the winter of 1942, a high flow in the river caused more water to enter the reservoir than could be drained by the uncontrolled permanent river outlets, and water was temporarily impounded to elevation 415. As the flow of the river dropped, the water impounded above the elevation of the permanent outlets drained through the uncontrolled permanent outlets into the river below the dam.

In 1943 needle valves for two of the four permanent river outlets and for the Madera Canal outlet were borrowed from Boulder Dam and were installed. The first storage of water in the reservoir by means of closing or partially closing one of these valves was started on February 21, 1944.

33. The Madera Canal was at least partially completed in 1944. The surface level of the water in the reservoir was then raised sufficiently to divert a large quantity thereof through the Madera Canal, from which it was used to raise the general water table in the area served by the canal. Approximately 302,500 acre-feet of water was stored behind the dam at this stage of the operation. The flow of water through the dam was never completely stopped. For the six months after the needle valves were installed, the quantity of water released monthly was approximately that required under the agreement of July 27, 1939, between the defendant and Miller & Lux and its subsidiaries. During and after September 1944 the releases were substantially larger than the requirements of such contract, except during the months of November and December 1944, when they were substantially equal to such requirements.

In 1945 by means of controls at permanent river outlets, the reservoir was filled to the base of the openings for the drum gates of the dam, creating storage of approximately 430,000 acre-feet of water. The installation of drum gates in the spillway section of the dam was completed approximately in August 1947, and these gates were first operated to impound water during the period from June 16, 1948, to July 13, 1948, when the elevation of the surface of the water in the reservoir rose to 8.13 feet above the base of the opening of the drum gates.

Partial operation of the Friant-Kern Canal was commenced on July 9, 1949, and deliveries of water from the reser-

28. This is the elevation of the invert of the river outlets, and is 70 feet above the normal low-water surface of the river before construction of the dam.

voir through the canal for irrigation purposes were made after that date.

In approximately August 1951, there were completed initial features of the Delta-Mendota Canal and the Tracy pumping plant, making possible the first integrated operation of the Central Valley Project.

Since placing the Delta-Mendota Canal into operation any substantial quantity of water passing plaintiffs' lands derives from sources other than the San Joaquin River, except in times of extraordinary flood.

## VI

### The Plaintiffs' Land and Its Water Supply

#### A. Reservations of Water Rights by Miller & Lux

34. Miller & Lux began acquiring land in the San Joaquin Valley as early as 1870. Within the next 50 years the corporation became the owner of large tracts of land riparian and nonriparian to the San Joaquin River and its tributaries.[29] Most if not all of these tracts were irrigated by Miller & Lux for one purpose or another, either directly or through subsidiaries and affiliated companies, including mutual water companies in which it owned stock.

Beginning in 1925, Miller & Lux instituted an intensive program for the sale of much of this land. Tracts of land of varying sizes were sold under deeds containing numerous and varied reservations, conditions, and covenants. Each deed, ordinarily, contained several reservations. The combinations of clauses employed varied widely, depending upon the location of the land, its condition, its use, and the character of the right under which it was supplied with water. The texts of 20 of these clauses, considered typical, are set forth in finding 67.

35. By a deed dated October 1, 1933, Miller & Lux conveyed to Cyrus J. Sheppard (plaintiffs' grantor) a tract which included the lands of plaintiffs. The Sheppard deed contained the following exceptions and reservations:

"(d) The riparian rights of the land herein conveyed shall always remain and be exercised subject and subordinate to the water rights of the party of the first part, its successor, subsidiary and affiliated companies, whether such water rights be riparian, appropriative or prescriptive, to the end that the party of the first part, its successors, subsidiary and affiliated companies may use, enjoy and transfer said water rights, including the right to contract for or permit storage on the upper reaches of the San Joaquin River without let or hindrance from the party of the second part, his heirs and assigns. These covenants and conditions shall not be construed as an extinguishment of the riparian rights of the land herein conveyed, but as an estoppel in favor of the party of the first part, its successors, subsidiary and affiliated companies, against the party of the second part, his heirs and assigns, to the extent herein provided.

"(e) It is further understood that the party of the first part reserves the right to conduct or carry excess or waste waters from any irrigation canal owned by the party of the first part or The San Joaquin & Kings River Canal & Irrigation Company Incorporated, or its successors and assigns, across the above described land, and that the party of the second part shall not acquire any right in or to said waters, and any use which the party of the second part shall make of said water shall be deemed to be permissive and not under claim of right.

"(f) This conveyance is made on condition that pending the sale and/or transfer of its grass land waters, or until the party of the first

29. As stated in finding 11, the holdings began with a narrow strip at Gravelly Ford and extended in varying widths down the valley as far as the junction of the San Joaquin and Merced Rivers.

part desires to change the place of use of said water to other lands, whether or not in ownership of the party of the first part; the party of the first part may divert from the San Joaquin River and apply to said lands, except those lands within the San Luis Canal Company, for the irrigation thereof, in the customary manner, the quantity of water heretofore applied according to past usage. The party of the second part shall acquire no right, title or interest in or to said water or the use thereof by virtue of said application of said water to said land.

"(g) It is further understood that the land herein conveyed is part of a larger tract of land belonging to the party of the first part bordering on a natural stream and watercourse and this conveyance shall in no way affect the riparian rights of the remainder of said tract of land retained and owned by the party of the first part, but such riparian rights shall be preserved and be unaffected by this conveyance."

### B.  Acquisition of Lands by Plaintiffs

36.   At all times since May 10, 1940, plaintiffs have been the equitable owners, and since November 1, 1940, have been in possession and entitled to possession of all those certain lots, pieces, and parcels of land, together with all rights appurtenant thereto, situated in the County of Merced, State of California, described in paragraph 1 in the petition, which description is incorporated herein by reference.

Plaintiffs acquired the lands, together with their appurtenant rights, by an agreement of sale dated May 10, 1940, between plaintiffs and Cyrus J. Sheppard,

under which the said Cyrus J. Sheppard agreed to convey to plaintiffs H. B. Wolfsen and his wife, Helen Wolfsen, as joint tenants, an undivided one-half interest in said land, and to plaintiffs L. C. Wolfsen and Myrna Wolfsen, his wife, as joint tenants, an undivided one-half interest in said land.

Said lands are part of a larger tract acquired, together with its appurtenant rights, by Cyrus J. Sheppard from Miller & Lux by deed dated October 1, 1933, as noted in the preceding finding.

37.   Plaintiffs' predecessor in interest, Cyrus J. Sheppard, was summoned in this action under Rule 19, 28 U.S.C.A. and filed answer as follows:[30]

"* * * That he makes no claim against the United States arising out of his former ownership of the lands described in paragraph 1 of the petition * * * and recognizes the right of the plaintiffs to maintain this action.

"* * * That he reserves all his rights against the plaintiffs arising out of the contract of sale of the said lands dated May 10, 1940 between him and the plaintiffs and arising out of any subsequent deed or deeds of trust covering said land."

### C.  Water Rights at the Time of Acquisition

38.   In the decision of Miller & Lux Incorporated v. Madera Irrigation District (finding 14) there were specific findings with respect to the riparian character of the lands of each of the plaintiffs herein. It was found that all of the lands of plaintiffs were riparian to the San Joaquin River or its sloughs except for two parcels of land containing a total of 214 acres.[31]

The remainder of plaintiffs' lands, comprising 4,039.37 acres,[32] were found

---

30.  Plaintiffs have asked for the finding of the first paragraph of the Sheppard answer; defendant, for the second. Except for these requests for findings there has been no other indication of an issue between the parties relating to plaintiffs' ownership of the lands in question.

31.  The legal descriptions of these two parcels are set forth in finding 68(a).

32.  The petition alleges that plaintiffs' lands "* * * contain in the aggregate 4,-297.96 acres." Deduction of 214 (non-riparian) acres from this total would

to be riparian to the river or its sloughs, as follows: (1) riparian to branches of Salt Slough, 370.98 acres; (2) riparian to Salt Slough, 55.1 acres; (3) riparian to Mud Slough, 321.07 acres; and (4) riparian to the San Joaquin River and various unspecified sloughs, 3,292.22 acres.[33]

39. When plaintiffs acquired the lands in suit, approximately 4,040 acres (of a total of 4,250 acres) were riparian to the San Joaquin River or to one or more of its sloughs. There is no evidence of action by plaintiffs (e. g., severance and conveyance) since their acquisition whereby any of such lands would have been deprived of their riparian status. The lands therefore retain their riparian status unless they have been deprived of it in whole or in part by actions to which plaintiffs were not parties.

### D. Water Supplies: Before and After [34]

40. (a) Before Friant Dam was built, water from the San Joaquin River reached the lands in suit in three ways: (1) through the overflow channel, when some of the lands were submerged by flood waters; (2) through the surface flow of water into the sloughs as part of the high channel of the river during its higher (but not flood) stages; and (3) through the return flow of irrigation water that had been distributed to lands upstream during the crop season. The return flow reached Salt Slough through underground aquifers.

(b) Each of these flows was seasonal. The overflows were intermittent, during April, May, or June. Surface flows in the sloughs, as distinguished from over-

flows, occurred just before and just after the overflow season. The return flows of irrigation water occurred only during the season in which irrigation was crucial to cultivated crops: July, August, and September.[35]

41. (a) Salt Slough, along which the lands of the plaintiffs lie, is one of the major sloughs tributary to the San Joaquin River. It does not head directly in the river but takes water from the river through another slough known as Pick Anderson Slough. Its principal importance to the owners of land riparian to the slough, however, lay not in the fact that it carried substantial amounts of water in the spring and winter (prior to the time the effect of storage at Friant was felt) but in the fact that a major part of the return flow from the land irrigated through the canals of the San Joaquin Canal Company and the San Luis Canal Company found its way into Salt Slough either directly or after passing through various drainage channels. During the summer months, when the irrigation demand was heaviest and sack dam was installed, the only supply of water in Salt Slough was in the form of return flow.

(b) Daily measurements of this return flow have been taken by the Bureau of Reclamation since 1941 at a point on the slough centrally located on plaintiffs' ranch. These measurements have been summarized in tables [36] which show that in 10 of the 12 years the supply available during July and August, the months of highest demand, was in excess of 70 second-feet (4,200 acre-feet per month).

42. (a) Upon the completion of Friant Dam the flow of San Joaquin

---

indicate 4,083.96 acres remaining. Plaintiffs have nevertheless developed their contentions on the basis of a total area of "4,250 acres, of which approximately 4,040 acres enjoyed riparian rights * * *." The Haines decree findings account for 4,253.37 acres.

33. The legal descriptions of these four parcels of riparian lands are set forth in finding 68(b). The four riparian parcels contain 4,039.37 acres, hereinafter rounded off at 4,040.

34. The findings under this heading relate to the supplies of water as distinguished from the rights to use water.

35. This is to say that the return flows were identifiable as such only during this season. From the standpoint of hydrology there may have been return flows during periods of overflow and surface flow.

36. The tables are set forth in finding 69.

water was controlled by defendant. The lands in suit were wholly deprived of the overflow. Surface flows in the sloughs to which the lands were riparian became dependent upon the timing and quantity of releases by defendant from Friant Reservoir. The controls of Friant Dam were in operation before the end of 1947.

(b) The lands in suit were not deprived of the return flow of irrigation water from the San Joaquin River by the operation of Friant Dam until August 1951, when the completion of the Delta-Mendota Canal made possible the supply of exchange waters. At all times prior to the completion of the Delta-Mendota Canal, the lands in suit received return flows of irrigation water having the San Joaquin River as its source in the same manner and to the same extent as if Friant Dam had not been built.

43. (a) Upon the completion of the Delta-Mendota Canal, through which water from the Sacramento River became available at Mendota, the supply of San Joaquin water to that portion of the valley located downstream from Mendota was stopped by controls at Friant Dam. Exchange waters from the Sacramento were simultaneously delivered at Mendota. The substitution of Sacramento for San Joaquin waters at Mendota has been continued ever since.

(b) Ever since the substitution of waters was begun, in August 1951, the lands of plaintiffs have been deprived of San Joaquin water in the return flows of irrigation water.

(c) Plaintiffs' lands have never been physically deprived, in whole or in part, of the return flows of irrigation water by the construction or operation of the Central Valley Project.

(d) So long as the great area of cropland lying generally to the southeast of plaintiffs' land continues to be irrigated, it is virtually certain that the flows in Salt Slough, during the irrigating season,

will be of the same order of magnitude as those shown in the tables set forth in finding 69. In many respects return flows, for this reason, provide a safer supply that one that is based upon the direct use of the natural flow of the stream but is subordinate to other prior rights.

## VII

### The Uses of Plaintiffs' Lands

*A. Physical Aspects of the Lands*

44. Plaintiffs' tract is irregular in shape. It lies along Salt Slough for a distance of approximately ten miles, rarely extending more than three-quarters of a mile from the slough except in the central portion. The land is of varying quality, containing as many as ten different types of soil. Alkalinity of the soil is a primary feature. Some 1,500 acres or more are heavily affected; another 1,400 acres are moderately affected; and about 1,100 acres are slightly affected, some being free of alkali.

*B. Actual Uses*

45. (a) Details of the use made of the lands in suit by Miller & Lux are not in evidence.[37] It is to be inferred, from such evidence as there is on the point, that Miller & Lux maintained most of the tract in permanent pasture, in the nature of controlled grasslands, relying on both the surface and return flows for irrigation water, and that some of the land was used to grow cultivated crops, using return flow water for irrigation.

(b) The evidence is virtually silent as to the use made of the lands by plaintiffs' predecessor in interest. The inference is that he used the lands almost exclusively for grazing cattle.

(c) Plaintiffs put the land to much the same use as had Miller & Lux: permanent pasture, predominantly, and some cultivated crops. The inferences are that they, too, used the surface and return flows to irrigate the pastureland, in the nature of controlled grasslands, and ir-

---

**37.** For example, the evidence is silent as to whether Miller & Lux used any of the tract for uncontrolled grasslands, relying on overflow for irrigation.

rigated the cultivated crops with the return flow.[38]

### C. Potential Uses

46. (a) Between the growing seasons of 1941 (the first during plaintiffs' possession) and 1951 (the last during which San Joaquin water was available in Salt Slough) several major events affected the potentials of the lands in suit. American participation in World War II extended from 1941 into 1945. The major portion of the Friant construction was done between 1941 and 1947. Unusual farm prosperity was prevalent during the years immediately following the war. The Korean War began in 1950, and was in full swing during 1951. The whole Central Valley Project was completed to the point of integrated operation in 1951.

(b) Following the end of World War II, and as the Friant projects neared completion (the dam and the north-south canals), the area affected by the Friant projects, including the San Joaquin Valley, faced the prospect of an expanding economy. One of the more dramatic aspects of this development was the successful use of large acreages for growing cotton by irrigation.[39]

Many surveys were made in the region of plaintiffs' lands to determine the possibility and the feasibility of developing for intensive irrigated farming lands theretofore devoted almost exclusively to cattle (and pasture). Some such developments were undertaken in plaintiffs' region.

47. (a) Plaintiffs themselves made a tentative beginning in cotton in 1951, using return flow water in Salt Slough for irrigation. In succeeding years (prior to the trial of this action in 1956), the growing of cotton was continued, but no extensive development of pasturelands for irrigated farming was undertaken.

(b) A considerable expenditure would be required to convert plaintiffs' land into irrigated farmland. The land would have to be carefully leveled, irrigation works constructed and levees provided, where necessary, for protection against floods. The cost of this development in 1951 was of the order of $100 per acre.

(c) If plaintiffs' lands were so developed, and assuming a sufficient supply of water for irrigation, cotton and other crops similarly nonresistant to alkali could be grown on that portion of the tract that is either free of alkali or only slightly affected (estimated at 500 to 1,000 acres); alfalfa, sugar beets, corn and other grains, and irrigated permanent pasture could be grown on the 1,400 acres that are moderately affected; and the 1,500 (or more) acres that are heavily impregnated would best be used for pasture.[40]

48. Prior to 1951, plaintiffs' lands received in Salt Slough by way of return flow a reasonably stable supply of water of the order of 70 second-feet or 4,200 acre-feet per month, or more.[41] As riparian owners plaintiffs were entitled to use the flow reaching their lands subject only to the needs of other riparian owners, with whom the water had to be equitably divided. The extent of the division reasonably to be anticipated on the basis of possible future development of other riparian lands would not be likely to exceed an even division, giving to plaintiffs reasonable assurance of a water supply under their riparian rights of 35 second-feet or 2,100 acre-feet per month. Such a supply would suffice for the development of 2,500 acres of plaintiffs' lands to the uses described in finding 47(c).

---

38. The evidence is silent as to their reliance on overflow to irrigate uncontrolled grasslands.

39. Simultaneously, some of the southern states east of the Mississippi began a new emphasis on the development of pastureland and the growing of beef cattle. The saying became a commonplace that cotton was moving west and cattle were moving east (south).

40. Continued irrigation of the heavily impregnated soil would offer a reasonable prospect of reducing the alkalinity in time from heavy to moderate, and the process might be accelerated through the application of soil amendments. Neither the time required for this development nor its cost is established by the evidence.

41. Finding 41(b).

49. (a) Prior to the substitution, in August 1951, of Sacramento for San Joaquin water in Mendota Pool, the uses outlined in finding 47(c) represented the highest and best potential use of the lands in suit.

(b) The attainment of such highest and best use was and is dependent upon (1) the existence of and (2) the right to use a dependable supply of water sufficient to meet the needs of irrigation.

(c) The return flows of water in Salt Slough since the introduction of the exchange waters at Mendota have been sufficient in volume and quality to meet the needs of irrigation described in finding 47(c).[42] This supply is likewise dependable.[43]

(d) The highest and best potential use of the lands in suit continues to be the use outlined in finding 47(c) unless plaintiffs, as they contend, have been deprived of all or virtually all legal right to use the return flow water in Salt Slough.

50. (a) If the plaintiffs were deprived, to the extent for which they contend, of the legal right to use the waters passing their lands in Salt Slough, their water supply was so impaired as to place the economic feasibility of developing their lands to their highest and best use on the borderline.

(b) The ground water under plaintiffs' lands contains such a percentage of salts as to preclude its use for irrigation unless water from another source (free of salts, or relatively so) were available to mix with the ground water in such proportions as to reduce the salt content of the mixture to feasible levels. Two sources of water for mixing were available. One was the water in the slough, which plain-tiffs say they could not legally use. The other was water in the Delta-Mendota Canal.

(c) Water could have been (and still could be) brought from the Delta-Mendota Canal to the lands of the plaintiffs. The delivery would involve the cost of transportation and the losses inherent in transportation. In 1951, the Bureau of Reclamation was delivering water at the canal at the price of $3.50 per acre-foot. The cost at that time of such water delivered to plaintiffs' lands would have been $4.25 per acre-foot. Whether or not the purchase of such a substitute supply, for use with or without supplement by ground water, was economically feasible is not established by the evidence. The uncertainties of the situation relating to water rights were such in 1951 as to preclude the purchase of such a substitute supply as a sound business venture at that time.

51. If, as plaintiffs contend, the introduction of exchange waters had the effect of leaving their lands dry (in the parlance of the region),[44] the highest and best use of the lands after August 1951 would have been the growing of natural pasture.

52. The use made of the lands by plaintiffs since August 1951, as heretofore noted,[45] has not reflected either (1) the development of the highest and best use wet (i. e., as irrigated farmland), or (2) retrenchment to the highest and best use dry (i. e., as natural pasture).

VIII

The Plaintiffs' Legal Rights

53. (a) Since August 1951 plaintiffs have continued to use water from the re-

---

42. Cf. finding 27, reciting that the supply of water guaranteed by the exchange contract is far better than the supply available prior to the construction of the Central Valley Project.

43. Cf. finding 43(d), reciting that so long as the great area of cropland lying southeast of plaintiffs' land continues to be irrigated, the flows in Salt Slough will continue in the same order of magnitude as before.

44. Lands having a dependable, sufficient supply of water for irrigation, with the right by purchase or in law to use the water, are described as wet. Lands without such a supply, because either of the absence of water or the lack of right, are dry.

45. Findings 45(c) and 47(a).

turn flow in Salt Slough under (1) claims of right (prescriptive and riparian), and (2) permissive license to appropriate unappropriated waters.

(b) No adjudication of plaintiffs' legal rights has been made.

54. The permit issued to plaintiffs to appropriate unappropriated water in Salt Slough constitutes a license,[46] founded on an administrative determination authorized by statute.[47] As such it has neither the dignity nor the sanction of a judicial determination.

55. (a) On November 19, 1951, plaintiffs filed application with the Division of Water Resources, Department of Public Works, of the State of California, for a permit to appropriate unappropriated waters in Salt Slough at three diversion points to the extent of a total of 50 second-feet (3,000 acre-feet per month), the diversions to be made by pumping from the unobstructed channel of the slough. The purposes listed were: for domestic use, the watering of 2,400 head of cattle; and for irrigation use, a total of 4,380 acres, segregated as 600 acres of rice, 500 acres of alfalfa, 800 acres of general crops, and 2,480 acres of pasture. The application further declared:

"The land to be irrigated has another water right or source of water supply other than that herein applied for. The nature and amount of the additional supply referred to is a prescriptive right to use water from Salt Slough, approximately 30 sec. ft. and riparian rights. * * *

" * * * In filing this application, applicants do not waive or relinquish any right, or rights, whatsoever that they may now have in or to any water whatsoever heretofore used or now being used or to which they may have the right to use upon the said lands herein referred to. * * * *"

(b) Plaintiffs' application was approved and the permit issued on March 25, 1954, subject to limitations (1) that construction work should be (i) begun on or before September 1, 1954, and (ii) completed on or before September 1, 1956, and (2) that complete application of the water should be made on or before December 1, 1957.[48]

56. (a) Plaintiffs' permit was the fourth one to be issued for diversion of water from Salt Slough, although in relation to the substitution of Sacramento for San Joaquin water at Mendota, plaintiffs' application was the first to be filed, and their permit was the first to be issued.[49]

(b) Two of the three permits antedating the one issued to plaintiffs were approved on January 31, 1949 (based on applications filed January 8, 1947), for 71.7 second-feet and 20.2 second-feet, respectively. The third permit was issued on January 19, 1951 (based on application filed December 12, 1949), for 3 second-feet. These three permits authorized downstream owners to divert from Salt Slough 94.9 second-feet, or 5,694 acre-feet per month. When plaintiffs' authorized diversion of 50 second-feet is added, the total authorized "appropriations of unappropriated" water in Salt Slough appears as 144.9 second-feet or 8,694 acre-feet per month.[50]

46. The permit is described in the next finding.

47. Appropriation by license can never ripen into prescriptive right. Appropriation as the basis of prescription has to be adverse.

48. The case was tried in June 1956. Whether or not plaintiffs have perfected their license is not established by the evidence.

49. It is not established that plaintiffs' priority in relation to their application for appropriation of the exchange water has any legal significance under California law. Neither is it established that the priority is without significance, although the issuing authority (an administrative agency) ascribed none to it.

50. While it does not appear that downstream accretions to the return flow in Salt Slough were considered in this connection, the fact remains that such accretions did occur, and in volume sufficient to contribute substantially to the satisfaction of the downstream appropriations.

57. (a) Before the permit was issued to plaintiffs a hearing was held on their application, evidence was presented on behalf of four protestants as well as the applicants, and a formal opinion containing summary and conclusions was filed as the basis of the order granting the permit. The order was signed by the State Engineer on behalf of the Department of Public Works of the State of California.

(b) The evidence relating to the supply of water in Salt Slough (as the basis for determination of the existence of unappropriated water) consisted of measurements taken before the substitution of exchange waters. The "Summary and Conclusions" contained the following:

"The facts summarized point to the conclusion that unappropriated water in the source from which the applicants seek to appropriate usually exists during November, December, January, February and March, that it usually exists also during April, May, June and July of years of average or above-average streamflow and during August, September and October of years of above-average streamflow, that it exists occasionally but infrequently at other times and that such unappropriated water insofar as it does exist may be taken and used in the manner proposed in the application without injury to any protestant."

(c) It is apparent from the foregoing (and the order as issued confirms) that plaintiff's application was processed and the permit issued on the basis of priority of right in the appropriators whose permits antedated plaintiffs'. Two of such appropriators were among the protestants.

58. One of the protests against plaintiffs' application was filed by the Department of Fish and Game of the State of California which was then seeking to acquire the lands of one of the prior appropriators for use as a waterfowl management area. On August 2, 1951, a report was submitted to the Public Works and Acquisition Division, Department of Finance, by the Division of Water Resources, Department of Public Works, both being departments of the State of California. The report was signed by the Supervising Hydraulic Engineer and the Senior Attorney. Among other elements it contained an analysis of some of the legal phases of the proposed acquisition. Following are pertinent excerpts from the analysis: [51]

" * * * There is a sound legal basis for the [San Luis] canal company asserting it has the right to recapture return flow, operational spill and waste above the point where the water leaves the works of the company or the boundaries of its lands. * * * [52]

" * * * Previous studies made as a basis for acquisition and exchange of the waters of the San Joaquin River by the United States to permit operation of Friant Dam as a unit of the Central Valley Project indicated that the water rights of both the Noble and Wolfsen lands fall in the same category. It has been considered that the riparian rights as well as other water rights of both the Noble and Wolfsen lands were reserved by Miller & Lux at the time said lands were sold by that company, and that said water rights were later sold to the United States.[53]

available for use on * * * additional land the return flows that were formerly the property of the plaintiffs under their riparian right. * * * "

51. Reproduction of these excerpts is intended to illustrate the contentions of their counsel in this case. The recitation does not purport to reflect findings of California law.

52. Plaintiffs have asked for the following finding: " * * * the [San Luis] canal company is in a position to extend its service area down-stream, making

53. Defendant's brief contains the following assertion: " * * * Under the reservation [in the deed of Miller & Lux to Sheppard], plaintiffs are subordinate to

"* * * the claims by canal company representatives that the Wolfsen lands have riparian rights * * * create uncertainties as to the exact nature of the water rights appurtenant to the Wolfsen * * lands * * *. A lengthy * * study of the * * * water rights is not considered justified because, in our opinion, riparian status of the Wolfsen lands would not entitle the owners thereof to divert water from Salt Slough other than *natural* flow.[54] [Emphasis supplied.]

"The operational spill by the canal company and return flow from lands served by the company constitute foreign water and not natural flow, being water imported into the drainage area by artificial means.[55]

"Foreign water does not inure to the riparian owners but is subject to appropriation under the procedure provided in the Water Code. * * * [56]

"* * * The canal company might at some future time contract to sell its return flow and operational spill to Wolfsen * * *. * * * such a sale * * * [might] be approved by the courts and * * any interference with delivery of water pursuant to such a sale * * [might] be enjoined. * * *

"Conclusion. * * * The recently inaugurated pumping from

Salt Slough by * * * Wolfsen * * * under the claim that it is being done in the exercise of riparian rights could be stopped by appropriate legal action. * * * "

## IX

### Miscellaneous

#### A. *The Feasibility Report*

59. Following are substantial portions of the letter of November 26, 1935, from the Secretary of the Interior to the President, which the President approved on December 2, 1935.[57]

"General Description of Project

"The Central Valley project embodies a plan for the conservation, regulation, distribution, and utilization of the water resources of the Sacramento and San Joaquin Rivers to provide urgently needed water supplies for existing agricultural, industrial, municipal developments in the Sacramento and San Joaquin Valleys and upper San Francisco Bay region which contains 3,000,000 acres of settled irrigated and productive land, and a population of 900,000 persons. In addition to providing new water supplies to meet serious problems of water shortage, the project contemplates the restoration of commercial navigation on the upper Sacramento River, increased flood protection for the valley lands,

---

the use and enjoyment of the riparian, appropriative and prescriptive rights of the subsidiary and affiliated companies. * * * "

54. Plaintiffs have requested findings as follows: "Under California law the owners of lands riparian to the river or to sloughs have the same right to the use of return flows as they do to the use of natural [surface] flows in the stream adjoining their lands. This is true, however, only when these return flows derive from the upstream irrigation that is part of the natural flow of the stream * *."

55. Among the findings requested by the plaintiffs was the following: "* * * If the upstream lands are irrigated with water that is brought in from a different

stream lying in a different watershed, the downstream riparian owners do not have the right to the use of the return flows that originate in upstream irrigation with these so-called foreign waters."

56. Another excerpt from plaintiffs' requested findings follows: "The principal owner of rights in foreign water is the person who has introduced the water into the stream. * * * To the extent that it is allowed to flow down the stream, rights to its use may be acquired by others through appropriation but these rights remain subject to the paramount right of the producer of the flow. * * * "

57. See finding 7 and footnote 5.

and incidentally the generation of about a billion and a half kilowatt-hours annually of hydroelectric energy.

The key unit of the project is Kennett Reservoir on the Sacramento River. A dam 420 feet high will regulate floods and store three million acre-feet of water. Water released from the reservoir, after generating hydroelectric power, will flow down the Sacramento River, maintaining adequate depths for navigation and furnishing ample supplies for irrigation, municipal, and industrial use along the main river and in the fertile delta region of the Sacramento and San Joaquin Rivers. Intrusion of salt water from the bay into the delta channels —a frequent occurrence in recent years causing substantial loss in crops and threatening destruction of productivity—will be prevented by the released waters. In addition water supplies will be made available in the delta channels for various uses in the nearby upper San Francisco Bay area, and for utilization in the San Joaquin Valley. Conduits to carry the supplies to these areas are provided. The supply for the San Joaquin Valley will be conveyed up the San Joaquin River through a series of pumping plants and intervening natural and artificial channels a distance of 150 miles lifting the water to an elevation of 160 feet above sea level. This water will replace San Joaquin River water now used for irrigation in the northern San Joaquin Valley, thus permitting the entire flow of the San Joaquin River to be regulated in Friant Reservoir—the second storage unit of the project—and to be utilized in the southern San Joaquin Valley where local supplies are deficient. Water from this reservoir will be delivered by gravity through conduits extending northerly and southerly to serve developed irrigated lands in an area extending from Madera County on the north to Kern County on the south.

"The cost of the project, estimated at $170,000,000, will be met by revenues from the sale of water and power.

"Water Supply

"The sources of water supply for the project are the Sacramento and San Joaquin Rivers and their tributaries. The State of California, pursuant to acts of the State Legislature has filed notices of appropriation on the principal streams, which are in good standing. Water supplies studies made by the Department of Public Works of California, U. S. War Department, and the U. S. Bureau of Reclamation, indicate on the basis of available data that the works of the project will provide an adequate water supply for all purposes.

"Engineering Features

"The principal engineering features of the project are as follows:

"Kennett Dam Unit. The Kennett Reservoir, the key unit of the project, is located in the Sacramento River near Redding in Shasta County. The dam will be 420 feet high and store 3,000,000 acre-feet of water. A 175,000 k.v.a. power plant will be located below the dam. A re-regulating afterbay with a 50,000 k.v.a. power plant will be constructed below the Kennett Dam. From the power plants a 200-mile power transmission line will extend to a main distributing substation near Antioch on Suisun Bay.

"Contra Costa Conduit. A canal, capacity 120 second-feet, with pumping plants, will extend westerly from the San Joaquin delta for 50 miles through Contra Costa County to supply municipal, industrial and agricultural water requirements.

"San Joaquin Pumping System. The works for this pumping system

will comprise a dam and other works in Sacramento delta to divert stored water from Kennett Reservoir through a channel into San Joaquin delta for salinity control, irrigation, and other purposes; dredging of existing channels in the San Joaquin delta; five dams and pumping plants on San Joaquin River to mouth of Merced River; and four pumping plants and 65 miles of canal on the westerly side of San Joaquin Valley which will deliver water to Mendota weir on San Joaquin River, elevation 160 feet. These works will be capable of furnishing a substituted supply of 1,000,000 acre-feet to 285,000 acres of land now irrigated from San Joaquin River.

"Friant Reservoir. A dam, 250 feet high, will be constructed on San Joaquin River, which will store 400,-000 acre-feet of water which will permit the diversion of San Joaquin River water southward at elevation 467 feet. One and one-half million acre-feet annually on the average will be available for transmission from the reservoir through the means of the San Joaquin River Pumping System and the purchase of water rights in the San Joaquin River.

"Friant-Kern Canal. The Friant-Kern Canal will extend from Friant Reservoir to Kern River, a distance of 157 miles and will be capable of serving an area of 1,000,000 acres of developed land.

"Madera Canal. The Madera Canal, maximum capacity 1,500 second-feet, will extend from Friant Reservoir to Chowchilla River, a distance of 35 miles and will be capable of furnishing irrigation water to an area of 140,000 acres.

"Estimated Cost of Project

Kennett Dam, Reservoir and power plants $84,000,000
Kennett transmission line and substation 14,000,000
Contra Costa Conduit ..................... 2,500,000
San Joaquin Pumping System ............ 19,000,000
Friant Dam and Reservoir ................ 14,000,000
Friant-Kern Canal ......................... 26,000,000
Madera Canal ............................. 3,000,000
Rights of way, water rights, and general
    expense ................................ 8,000,000
                                          _____
    Total ................................. *170,000,000

* So in the original.

"Part of the water supply is to be obtained by the purchase of water now used for the irrigation of pasturelands and this will result in the retirement from use of 250,000 acres of submarginal land, as compared to a small and gradual increase of irrigated land."

### B. Appropriation Acts [58]

60. (a) Following are acts by which Congress has appropriated money for the construction of the Central Valley Project:

"June 22, 1936, c. 689, 49 Stat. 1597, 1622.... $6,900,000
August 9, 1937, c. 570, 50 Stat. 564, 597.... 12,500,000
August 26, 1937, c. 832, 50 Stat. 844, 850.... 12,000,000
May 9, 1938, c. 187, 52 Stat. 291, 324........ 9,000,000
May 10, 1939, c. 119, 53 Stat. 685, 719....... 10,000,000
April 6, 1940, c. 77, 54 Stat. 83, 87.......... 5,000,000
June 18, 1940, c. 395, 54 Stat. 406, 438...... 23,600,000
June 28, 1941, c. 259, 55 Stat. 303, 336........ 34,750,000
July 2, 1942, c. 473, 56 Stat. 506, 536........ 39,019,000
July 12, 1943, c. 219, 57 Stat. 451, 476....... 22,569,000
June 28, 1944, c. 298, 58 Stat. 463, 490....... 960,200
July 3, 1945, c. 262, 59 Stat. 318, 342........ 4,500,000
Dec. 28, 1945, c. 589, 59 Stat. 632, 647 ...... 19,215,000
July 1, 1946, c. 529, 60 Stat. 348, 367....... 12,685,622
July 25, 1947, c. 337, 61 Stat. 460, 475....... 9,141,288
Dec. 23, 1947 c. 524, 61 Stat. 941, 944...... 11,405,000
June 29, 1948, c. 754, 62 Stat. 1113, 1129..... 41,358,900
May 10, 1948, c. 270, 62 Stat. 213, 221....... 1,000,000
Oct. 12, 1949, c. 680, 63 Stat. 765, 782........ 60,789,890"

(b) The acts of August 26, 1937, 50 Stat. 844, 850, and of October 17, 1940, c. 895, 54 Stat. 1198, 1200, reauthorized the project, and the act of July 30, 1941, c. 334, 55 Stat. 612, in aid of the construction of the project, provided for acquisition of Indian lands embraced therein.

### C. Details of Haines Decrees

61. (a) The material appropriative rights adjudicated in the Haines decrees are identified and the maximum quantities to which they were adjudicated to be entitled are as follows: [59]

58. See finding 8.

59. See finding 15.

| "Name | Maximum cubic feet per second | Yearly maximum acre-feet |
|---|---|---|
| Case No. 25,729, Miller & Lux, plaintiff: | | |
| Aliso Canal (diverted from head of Aliso Slough) | 302 | 59,784 |
| Chowchilla Canal (diverted from Lone Willow Slough) | 120 | 49,300 |
| Columbia Canal (diverted through Lone Willow and Brown Sloughs) | 150 | 45,374 |
| Lone Willow Slough, Aliso Slough, Brown Slough (diverted through various weirs, dams, levees, and other works) | 313 | 61,907 |
| Temple Slough | 463 | 157,298 |
| San Joaquin Canal (diverted by Miller & Lux through canals of San Joaquin & Kings River Canal & Irrigation Co.) | 285 | 128,294 |
| Mowry Slough (Little San Joaquin) | 26 | 5,218 |
| Borland Ranch | 14 | 7,580 |
| Pick Anderson Slough (diverted by canals taking out of Pick Anderson Slough and by dams and levees in and along said slough and its branches) | 88 | 17,600 |
| Orestimba Grant (diverted through Poso, Temple, Santa Rita, Pick Anderson, and other sloughs by weirs, dams, and levees in and along said sloughs) | 264 | 52,264 |
| Case No. 25,730, San Joaquin & Kings River Canal & Irrigation Co., Incorporated (diverted through Main, Outside and Helm Canals and Helm Ditch) | 1,360 | 512,730 |
| Case No. 25,731, San Luis Canal Co. (now known as Helm Canal) | 540 | 176,388" |

(b) Following are the names of and the limits on the additional appropriative and prescriptive rights described in finding 15(b) as (1) additional to those listed in the preceding subsection of this finding, (2) entitled to be satisfied out of San Joaquin waters flowing past Friant, and (3) upstream from the lands of plaintiffs:

| "Name | Maximum cubic feet per second | Maximum yearly acre-feet |
|---|---|---|
| Gravelly Ford Canal Co. | 600 | 39,314 |
| Firebaugh Canal Co. | 300 | 68,025 |
| James and Tranquillity Irrigation Districts | | 29,300 |
| Blythe Canal | | 11,600 |
| Edison Securities Cos. | | 6,100" |

## D. Diversions by Miller & Lux and Others

62. The following tabulations reflect the diversions of water, during the periods 1932–1939 and 1940–1951, by Miller & Lux and affiliated companies pursuant to their apropriative and prescriptive rights as described in finding 15.[60]

60. See also finding 18.

| "Year | M & L— below Aliso Canal | Aliso Canal | Gravelly Ford Canal | Total |
|---|---|---|---|---|
| | *Acre-feet 1932-39* | | | |
| 1932 | 944,346 | 45,546 | 37,288 | 1,027,180 |
| 1933 | 837,852 | 27,878 | 7,756 | 873,486 |
| 1934 | 612,016 | 8,852 | 308 | 621,176 |
| 1935 | 282,159 | 47,239 | 28,491 | 903,889 |
| 1936 | 781,238 | 51,810 | 25,005 | 858,053 |
| 1937 | 767,807 | 57,013 | 53,538 | 878,378 |
| 1938 | 777,992 | 24,306 | 106,525 | 908,823 |
| 1939 | 790,988 | 11,265 | 3,468 | 805,721 |
| | *1940-51* | | | |
| 1940 | 771,866 | 36,093 | 45,695 | 853,654 |
| 1941 | 715,700 | 32,558 | 85,564 | 833,822 |
| 1942 | 803,829 | 53,366 | 62,010 | 919,205 |
| 1943 | 829,219 | 30,165 | 52,596 | 911,980 |
| 1944 | 798,260 | 8,179 | 3,116 | 809,555 |
| 1945 | 974,741 | 24,912 | ............ | 999,653 |
| 1946 | 961,412 | 29,578 | 1,749 | 992,739 |
| 1947 | 830,650 | 11,842 | 1,220 | 843,712 |
| 1948 | 865,005 | 60 | 9,226 | 874,291 |
| 1949 | 859,297 | ............ | 13,391 | 872,688 |
| 1950 | 823,139 | ............ | 5,105 | 828,244 |
| 1951 | 799,972 | ............ | 464 | 800,436" |

63. The following table shows, in the first column, for each month, the total maximum rate of diversions for appropriations as derived from Table No. 3 of Report No. 3 of the Water Project Authority of the State of California, as described in finding 20(b). The figures in the first column include the maximum rate of diversions of the East Side Canal Company. The final column shows the maximum monthly permissible diversion rate for the appropriations listed therein:

| "Month | Maximum rate of diversion under flow schedule | Maximum permissible rate of diversion for all appropriative rights |
|---|---|---|
| October | 2,425 | 3,880 |
| November | 2,125 | 3,628 |
| December | 2,050 | 3,427 |
| January | 2,300 | 3,566 |
| February | 2,525 | 3,935 |
| March | 3,445 | 4,409 |
| April | 4,220 | 4,974 |
| May | 4,585 | 5,179 |
| June | 4,860 | 5,234 |
| July | 4,020 | 5,214 |
| August | 3,795 | 5,108 |
| September | 3,025 | 4,501" |

64. The rates of flow specified in the contract of July 27, 1939 (between Miller & Lux and its subsidiaries and defendant) as being reserved by Miller & Lux

were mean daily flows in cubic feet per second as follows:

| "During the month of— | Number of cubic feet per second plus the Chowchilla Canal right [1] |
|---|---|
| January | 400 |
| February | 535 |
| March | 1,310 |
| April | 1,950 |
| May | 2,285 |
| June | 2,450 |
| July | 2,475 |
| August | 2,210 |
| September | 1,335 |
| October | 660 |
| November | 485 |
| December | 400 |

[1] The Chowchilla Canal right varies according to the flow, the maximum per year being estimated at 49,300 acre-feet."

## E. Discharges of the River

65. (a) By ten-year periods, the average yearly discharge of the San Joaquin River at Friant was as follows:

| "Years | Yearly average in acre-feet |
|---|---|
| 1947–1955, inclusive | 1,487,800 |
| 1937–1946, inclusive | 2,030,300 |
| 1927–1936, inclusive | 1,286,200 |
| 1917–1926, inclusive | 1,463,700 |
| 1907–1916, inclusive | 2,210,044 |
| 1897–1906, inclusive | 1,799,157" |

(b) The yearly cycle of such discharge, with its variability, is illustrated by the following table showing the percentage of the yearly total discharged each month:

| "Month | Monthly percentage for the year 1945 | Average monthly percentage for the period 1905–43, inclusive |
|---|---|---|
| January | 3.42 | 4.66 |
| February | 9.96 | 5.43 |
| March | 7.39 | 8.39 |
| April | 11.63 | 13.17 |
| May | 16.68 | 21.18 |
| June | 16.48 | 21.51 |
| July | 10.03 | 11.27 |
| August | 4.81 | 4.43 |
| September | 3.84 | 2.65 |
| October | 4.47 | 2.25 |
| November | 4.68 | 2.04 |
| December | 6.61 | 3.02" |

## F. Statistics of Friant Dam

66. The following table sets out the elevations above sea level and corresponding elevations above the normal low-water surface of the river at the site of Friant Dam:

| | "Elevation in feet above mean sea level | Height in feet above normal low-water surface of river |
|---|---|---|
| Roadway on top of dam | 583 | 277.4 |
| Water surface with drum gates raised | 578 | 272.4 |
| Water surface without drum gates | 560 | 254.4 |
| Center line of outlet to the Friant-Kern Canal | 464 | 158.4 |
| Center line of outlet to the Madera Canal | 446 | 140.4 |
| Invert of river outlets | 375.42 | 69.82 |
| Floor of temporary construction openings | 316 | 10.4 |
| Normal low-water surface of river | 305.6 | 0 " |

### G. *Miller & Lux Reservations*

67. Following are the texts of 20 of the clauses, considered typical, of the reservations contained in contracts and deeds through which Miller & Lux Conveyed their holdings in the course of their selling program begun in 1925:

"1. All water rights, and riparian rights, if any, appurtenant to said land except as expressly herein provided.

"2. All water rights, if any, whether riparian, appropriative or prescriptive.

"3. All water rights, if any, whether riparian, appropriative or prescriptive, including right to receive water released from storage reservoirs or San Joaquin River.

"4. The right to take, divert, store and use the waters of the San Joaquin River and its tributaries, whether naturally flowing therein, or being thereinafter stored or used by any other persons, at any place or places above the land herein conveyed, and use the same for the irrigation of riparian or non-riparian lands, and/or for the production of hydroelectric power or any other purpose for which the party of the first part desires to use the same. The rights herein reserved may be transferred to and exercised by any public district or private corporation, firm, or individual to which the party of the first part may transfer or assign said rights. Provided, however, that nothing herein contained shall be construed to in any way affect any right of the parties of the second part to take, divert or use on the land herein conveyed, any water flowing in the said river at their said land, and not taken, diverted or used by the party of the first part, or anyone to whom the party of the first part has or shall hereafter grant the right to divert water, but nothing herein contained shall obligate the party of the first part, or its assigns to permit, or cause to be permitted, any amount of water of the said river to be or flow at the land herein conveyed.

"5. It is further understood that the purchaser waives any right which he may have to object to the storage and/or impounding of the waters of the San Joaquin River or its tributaries, by the seller or by the San Joaquin River Water Storage District, or by any other public district or private company to which the seller may or has granted the right to store said water, and the purchaser hereby expressly consents to said storage without limit, and relinquishes any right to receive water released from said storage; the purchaser also relinquishes and waives any right he may have to object to the said Water Storage District, and/or the seller and its assigns, diverting the waters of the San Joaquin River at any point, or points thereon, to riparian or non-riparian lands, within or without the watershed; said right of storage and said right to divert the waters of said river shall be considered as an easement in and shall bind said land regardless of the ownership thereof.

"6. This conveyance is made on condition that the riparian rights of the land herein conveyed shall always remain and shall always be exercised subject and subordinate to the water rights of the parties of the first part, its successors, subsidiary and affiliated companies (including mutual water companies in which the party of the first part owns stock), whether such water rights be

riparian, appropriative or prescriptive, to the end that the party of the first part, its successors, subsidiary and affiliated companies, may use, enjoy and transfer said water rights, including the right to contract for or permit storage on the upper reaches of the San Joaquin River, without let or hindrance from the party of the second part, his heirs and assigns. This covenant and conditions shall not be construed as an extinguishment of the riparian rights of the land herein conveyed, but as an estoppel in favor of the party of the first part, its successors, subsidiary and affiliated companies, against the party of the second part, his heirs and assigns, to the extent herein provided.

"7. It is further understood that the land conveyed is part of a larger tract belonging to the party of the first part bordering on a natural stream or water-course and this conveyance shall in no way affect the riparian rights of the remainder of said tract of land retained and owned by the party of the first part, but such riparian rights shall be preserved and be unaffected by this conveyance.

"8. Pending the sale of its grass land waters to the San Joaquin River Water Storage District or other water storage district or irrigation district, or until the party of the first part desires to change the place of use of said water to other lands, whether or not in ownership of the party of the first part, party of the first part shall divert from the San Joaquin River and apply to said lands for the irrigation thereof, in the customary manner, the quantity of water heretofore applied according·to past usage. Party of the sec-

ond part shall acquire no right, title or interest in said water or the use thereof by virtue of said application of said water to said land.

"9. Pending sale and/or transfer of its grass land waters, or until seller desires to change place of use of said water to other lands, whether or not in ownership of seller, seller may divert from San Joaquin River and apply to said land for the irrigation thereof, in the customary manner, the quantity of water heretofore applied according to past usage. Purchaser shall acquire no right, title or interest in or to said water or the use thereof by virtue of said application of said water to said land.

"10. It is further understood that this conveyance is made on the express condition that the grantee, for and on behalf of himself, his heirs and assigns, waives and re-relinquishes any right which he may have to object to the storage and/or impounding of the waters of the San Joaquin River, or its tributaries, by grantor or by any public or semi-public district or private company to which the grantor may or has granted the right to store said waters and grantee hereby expressly consents to said storage without limit, and relinquishes any right to receive water released from said storage; grantee also relinquishes and waives any right he may have to object to grantor and/or its assigns or successors diverting waters of the San Joaquin River at any point or points thereon, to riparian or non-riparian lands, within or without the watershed of said river; said right of storage and said right to divert the waters of said river shall be considered as an easement in and shall bind the land herein conveyed, regardless of ownership.

"11. That certain indenture dated the 14th day of September, 1939, between Miller & Lux Incorporated, a corporation, and Gravelly Ford Canal Company, as Grantors, and The United States of America, as Grantee, wherein, among other things, said Grantors conveyed to said Grantee certain Grantors' rights in and to the waters of the San Joaquin River, and in and to the use thereof, including the right against said Grantors and the lands and other properties described in said conveyance to perpetually divert, store and use said water within and without the watershed of said river. The lands herein conveyed are described in said conveyance to the United States. Said deed of conveyance was recorded on September 18, 1939, in the office of the County Recorder of each of the following Counties, as follows: In Fresno County, California, in Vol. 1810 of Official Records, at page 25; in Madera County, California, in Vol. 247 of Official Records, at page 88; in Merced County, California, in Vol. 623 of Official Records, at page 410; in Stanislaus County, California, in Vol. 703 of Official Records, at page 1.

"12. The right and title to all water being beneath the surface of the above described land excepting so much of said water as the party of the second part may develop on said premises for exclusive right of use thereupon.

"13. This conveyance is made subject to the following conditions, covenants, and reservations:

"To all existing water rights of the Grantor and its subsidiary companies, to wit: The San Joaquin & Kings River Canal & Irrigation Company, Incorporated, Gravelly Ford Canal Company, Firebaugh Canal Company, Columbia Canal Company, San Luis Canal Company and Santa Rita Irrigation Company, and whether established by appropriation, prescription or existing contract, and the right of the Southern California Edison Company, Ltd. and the San Joaquin Light & Power Corporation to store the water of the San Joaquin River under existing contracts with the Grantor.

"To the right of Grantor and said subsidiary companies to sell and convey any water right already established in it or them, by appropriation or prescription, in or to the waters of the San Joaquin River or its tributaries (Grantor hereby declares that it will never assert as against Grantee, his heirs, successors and assigns, that an appropriative or prescriptive water right is appurtenant to the land herein conveyed), and to store and/or change the place of use of such water, whether within or without the watershed of said river, and such right of storage of such water, the right to which has already been established by appropriation or prescription, and/or change of place of its use, may be exercised by any purchaser or assignee of said water rights.

"The covenants herein contained shall run with and be binding on any land herein conveyed, regardless of the ownership thereof.

"14. Riparian rights, if any, appurtenant to said land and any rights of said land to receive water for irrigation from the existing canals of the party of the first part.

"15. It is further understood that the party of the first part has

heretofore irrigated said land with water obtained from the San Joaquin River by and through the Chowchilla Canal. Said water and water rights are expressly reserved by the party of the first part and the party of the second part shall not be entitled to receive the same. The party of the first part may sell and/or transfer said water rights to be used on land other than that herein described.

"16. Nothing herein contained shall be construed as an extinguishment, abandonment, or waiver of the riparian rights of the lands conveyed herein or as a conveyance of the riparian rights of said lands or as otherwise affecting said rights except as to and in favor of the party of the first part, its subsidiary and affiliated companies and for each of their successors and assigns.

"17. The land above described is riparian to Mariposa Slough and other sloughs, and purchaser shall have a right to make a reasonable use as a riparian owner and in common with lower riparian land (including that of seller) of any water which may at any time be actually flowing in said sloughs as the same passes said above described land. It is expressly understood and agreed, however, that the seller reserves the right to store, impound, divert and use all or any part of the waters of the San Joaquin River and its tributaries, whether naturally flowing therein or being therein, after being stored or used by third persons at any point or points above the land herein agreed to be conveyed, and use the same for the irrigation of riparian or non-riparian lands, whether within or without the watershed of said river, and/or for the production of hydroelectric power.

The rights herein reserved may be transferred to and exercised by the United States of America, the State of California, or any of their agencies, any public district, private or mutual water company, firm or individual, to which seller may transfer or assign said rights. These reserved rights shall constitute an easement in said lands so agreed to be conveyed and the riparian rights hereto.

"18. Nothing herein in this Indenture contained shall be construed as reserving to Grantor any underground water contained in the lands herein conveyed, or preventing Grantee from drilling and developing water wells on any of said lands for irrigation, domestic and other uses on said lands.

"19. It is specifically understood and agreed that the reservation of all water rights as hereinabove provided in paragraph 3(d), together with the right to transfer and sell same, applies to the water of Kings River flowing in Fresno Slough, as well as to the water of the San Joaquin River; provided, however, that nothing herein in this agreement contained shall prevent purchaser from developing underground water for use on said land.

"20. It is expressly understood and agreed that Grantor reserves the right to store and impound at any point or points above the land herein conveyed all or any part of the water flowing in the San Joaquin River, or any of its tributaries; Grantor also reserves the right to take and divert at any point or points above the land herein conveyed all or any part of the waters of said river and its tributaries, whether naturally flowing therein or being therein after being stored, and thereafter use such

waters for irrigation of riparian or non-riparian lands within or without the watershed of said river and whether or not owned by Grantor, and for the production of hydroelectric power. * * * The rights herein reserved shall constitute an easement in the land herein conveyed, and the covenants herein contained shall run with and be binding on said land."

## H. *Legal Descriptions of Plaintiffs' Lands*

68. (a) The two parcels of land not found to be riparian to the San Joaquin River or its sloughs in the decision of Miller & Lux v. Madera Irrigation District (finding 14) are described as follows:

"Parcel No. 1, being in Section 35, Township 8 South, Range 10 East, M. D. B. & M.; All that portion of the Northeast quarter of said Section 35, lying Northeast of the center line of the San Luis Canal, containing 155 acres.

"Parcel No. 2, being in fractional Section 19, Township 9 South, Range 11 East, M. D. B. & M.; All that portion of the Northwest quarter of said fractional Section 19, lying Southwest of the Sanjon de Santa Rita grant line and lying Northeast of the north line of a parcel of land conveyed by Cyrus J. Sheppard, a single man, to Milton W. Terrill, et al., by deed recorded April 15, 1939, in Book 608 Official Records on page 263, County of Merced, State of California, containing 59 acres."

(b) The four parcels found to be riparian are described as follows:

"Of the land described in the petition, that part lying within the SW/4 and in the W/2 of SE/4 of Section 26 (133.15 acres) and in the SE/4 of Section 35 (142.33 acres), both in T. 8 S., R. 10 E., M. D. B. & M. and in the N/2, the N/2 of the S/2, and the SE/4 of the SE/4 of Section 2 (95.50 acres) in T. 9 S.R. 10 E., M. D. B. & M. was found to be riparian to branches of Salt Slough.

"Of the land described in the petition, that portion lying within the E/2 of the SE/4 of Section 26, T. 8 S., R. 10 E., M. D. B. & M. (55.1 acres) was found to be riparian to Salt Slough.

"Of the land described in the petition that portion lying within the NE/4 of the SW/4 of Section 13 and in the E/2 and the NW/4 of Section 24 (approximately 321.07 acres) all in T. 9 S., R. 10 E., was found to be riparian to Mud Slough.

"The remainder of the land described in the petition, approximately 3,292.22 acres, lies within the Santa Rita grant and was found to be riparian to the San Joaquin River and various unspecified sloughs."

## I. *Return Flows in Salt Slough*

69. (a) Table 1, appearing herewith, presents a summary of daily measurements of the return flow of irrigation water in Salt Slough made by the Bureau of Reclamation during the period 1940–1952. The table is in terms of mean daily flows per month in second-feet.

(b) Table 2, appearing herewith, presents a further summary of the data described in subsection (a) of this finding, and is in terms of mean daily flows in acre-feet.

TABLE 1.—*Mean Flows in Cubic Feet per Second and Monthly Runoffs in Acre-Feet of Salt Slough near Los Banos*

[Mean Flow in Cubic Feet per Sec.]

| Year | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1940–41 | ...... | ...... | 368 | 870 | 1,470 | 1,822 | 1,558 | 1,844 | 2,202 | 1,198 | 179 | 122 |
| 1941–42 | 58.1 | 160 | 590 | 878 | 1,120 | 573 | 843 | 975 | 1,850 | 695 | 68.9 | 61.6 |
| 1942–43 | 61.3 | 256 | 385 | 416 | 913 | 1,321 | 1,257 | 1,098 | 849 | 129 | 81.9 | 97.6 |
| 1943–44 | 60.8 | 77.6 | 146 | 131 | 101 | 104 | 137 | 132 | 141 | 116 | 96.4 | 91.5 |
| 1944–45 | 74.6 | 95.7 | 113 | 125 | 633 | 300 | 443 | 802 | 596 | 251 | 222 | 190 |
| 1945–46 | 143 | 152 | 235 | 445 | 234 | 138 | 236 | 439 | 268 | 130 | 133 | 208 |
| 1946–47 | 134 | 118 | 178 | 218 | 104 | 125 | 155 | 165 | 114 | 96.7 | 99.0 | 127 |
| 1947–48 | 63.9 | 48.8 | 51.5 | 57.3 | 35.9 | 34.3 | 77.1 | 92.1 | 95.9 | 85.9 | 104 | 196 |
| 1948–49 | 104 | 60.7 | 44.0 | 60.0 | 54.4 | 127 | 138 | 176 | 104 | 49.1 | 43.8 | 29.9 |
| 1949–50 | 17.2 | 25.7 | 40.7 | 44.7 | 34.0 | 58.0 | 94.4 | 75.5 | 55.1 | 44.5 | 35.6 | 57.0 |
| 1950–51 | 47.3 | 71.2 | 344 | 314 | 453 | 103 | 117 | 93.4 | 62.1 | 78.0 | 79.2 | 71.6 |
| 1951–52 | 29.1 | 35.8 | 52.5 | 155 | 619 | 538 | 1,119 | 1,279 | 1,192 | 235 | 110 | 73.3 |

TABLE 2.—*Mean Flows in Cubic Feet per Second and Monthly Runoffs in Acre-Feet of Salt Slough near Los Banos*

[Runoff in Acre-Feet]

| Year | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1940–41 | ...... | ...... | 13,880 | 53,520 | 81,620 | 112,000 | 91,500 | 113,400 | 135,800 | 73,660 | 11,030 | 7,270 |
| 1941–42 | 3,570 | 9,530 | 36,310 | 53,960 | 62,180 | 35,250 | 50,160 | 59,920 | 110,100 | 42,720 | 4,240 | 3,670 |
| 1942–43 | 3,770 | 15,220 | 23,670 | 25,610 | 50,710 | 81,220 | 74,780 | 67,480 | 50,520 | 7,950 | 5,040 | 3,810 |
| 1943–44 | 3,740 | 4,620 | 8,990 | 8,080 | 5,840 | 6,400 | 8,140 | 8,130 | 6,400 | 7,120 | 5,920 | 5,450 |
| 1944–45 | 4,590 | 5,690 | 6,960 | 7,690 | 35,170 | 18,470 | 26,350 | 54,850 | 35,470 | 15,400 | 13,630 | 11,290 |
| 1945–46 | 8,760 | 9,030 | 14,440 | 27,330 | 13,010 | 8,470 | 13,460 | 27,000 | 15,920 | 8,020 | 8,200 | 12,360 |
| 1946–47 | 8,270 | 7,000 | 10,970 | 13,430 | 5,760 | 7,710 | 9,250 | 10,120 | 6,760 | 5,950 | 6,090 | 7,570 |
| 1947–48 | 3,930 | 2,910 | 3,170 | 3,520 | 2,060 | 2,110 | 4,590 | 5,660 | 5,709 | 5,280 | 6,370 | 11,670 |
| 1948–49 | 6,390 | 3,610 | 2,700 | 3,690 | 3,020 | 7,820 | 8,240 | 10,820 | 6,160 | 3,020 | 2,700 | 1,780 |
| 1949–50 | 1,060 | 1,530 | 2,500 | 2,750 | 1,890 | 3,570 | 5,620 | 4,650 | 3,280 | 2,740 | 2,190 | 3,390 |
| 1950–51 | 2,910 | 4,240 | 21,170 | 19,300 | 25,170 | 6,360 | 6,980 | 5,740 | 3,700 | 4,800 | 4,870 | 4,280 |
| 1951–52 | 1,790 | 2,130 | 3,230 | 9,540 | 35,580 | 33,070 | 66,600 | 78,640 | 70,940 | 14,480 | 6,750 | 4,360" |

## Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and their petition is dismissed.